UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

LORI ELLIS,

                                  Plaintiff,                **MEMORANDUM & ORDER**
                                                        11-CV-2440 (MKB)

       v.

CENTURY 21 DEPARTMENT STORES,

                                  Defendant.

---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      Plaintiff Lori Ellis brings the above-captioned action against Defendant Century 21 Department Stores, alleging claims of gender discrimination based on failure to promote and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* ("NYCHRL"). Defendant has moved for summary judgment. For the reasons set forth below, Defendant's motion for summary judgment is denied.

    **I.**   **Background**

        **a.**   **Defendant's Management Structure**

      Defendant operates a chain of retail department stores that sell designer apparel and accessories to the public at discount prices. (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.) Defendant was founded in the early 1960's by the Gindi families and currently operates seven stores that employ approximately 4,000 employees. (Def. 56.1 ¶¶ 2–3; Pl. 56.1 ¶¶ 2–3.) Defendant's business is divided between merchandising and operations. (Def. 56.1 ¶ 5; Pl. 56.1 ¶ 5.) Merchandising involves the purchase, presentation and sale of the goods that Defendant sells in its stores, while

operations involves running the stores and the overall business, including staffing of the stores and "profit and loss." (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.) The merchandising side of the business is run by co-CEO I.G. Gindi, and the operations side of the business is run by co-CEO Raymond Gindi. (Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.)

On the merchandising side of the business, a Divisional Merchandise Manager ("DMM") leads each of the different departments, such as Men's, Ladies', Children's, Lingerie, Linens, Housewares, Cosmetic and Handbags. (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.) The DMMs decide where to purchase the merchandise, how to price it and how to display it in stores, and they have direct financial responsibility for their department. (Def. 56.1 ¶¶ 9–10; Pl. 56.1 ¶¶ 9–10.) The DMMs report to I.G. as the head of merchandising, and I.G. also functions as the DMM of the Men's department. (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.) The Buyers and Coordinators report to the DMMs. (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.) The Buyers locate and purchase merchandise for their department, while the Coordinators act as a liaison between the DMM and the sales staff in the stores to "ensure that there is sufficient merchandise on the selling floor and that merchandise is displayed and priced properly." (Def. 56.1 ¶¶ 13–14; Pl. 56.1 ¶¶ 13–14.)

### b.   Plaintiff's Initial Employment — 1997 to 2007

Plaintiff was hired by Defendant on December 15, 1997, as a Handbags Coordinator, reporting to DMM Jamie Barry. (Def. 56.1 ¶¶ 16–19; Pl. 56.1 ¶¶ 16–19.) Plaintiff was "responsible for making sure that the managers in the Handbags department in the stores were properly trained and scheduled and that the Company's standards were being met." (Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.) In or about July 1998, Plaintiff was promoted to Men's Operations Coordinator, reporting directly to I.G. (Def. 56.1 ¶¶ 16, 20; Pl. 56.1 ¶¶ 16, 20.) As Men's Operations Coordinator, Plaintiff performed the same duties for the Men's department as she had for the Handbags department. (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.) She also oversaw scheduling for

the holiday season, the operation of the department fitting rooms and stockrooms, and "certain operational aspects of [the department's] buying office, including devising and administering various training programs for its assistant buyers and training and supervising its clerical staff." (Def. 56.1 ¶ 21; Pl. 56.1 ¶¶ 21, 229.)  Plaintiff claims that her responsibilities began to branch out beyond the Men's department, as she began "serving as an all-purpose resource for DMMs seeking help in connection with issues they encountered," and she assisted the director of the human resources department at job fairs, troubleshooting operational issues at the company warehouse, "tending to [D]efendant's most important, or 'VIP,' vendors," and running Defendant's "VIP Night."  (Pl. 56.1 ¶ 230.)

    In 2001 or May 2002,[1] Plaintiff became the Senior Operations Coordinator.  (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.)  Plaintiff continued to report to I.G. and her responsibilities expanded to include working with the Lingerie and Shoes departments.  (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.) According to Plaintiff, she actually assumed the role of Coordinator for those two departments, as they were operating without Coordinators at that time.  (Pl. 56.1 ¶ 22.)  As part of this new role, she was entrusted to communicate I.G.'s vision for the company to other departments and "cultivate an interdepartmental consistency and cohesion."  (Pl. 56.1 ¶ 231.)  Plaintiff also began assisting with the opening of new stores.  (Pl. 56.1 ¶¶ 234–37.)  In 2002, Plaintiff assisted with the opening of the Morristown store.  (Pl. 56.1 ¶¶ 235–37.)  According to General Store Manager ("GSM") Bill O'Malley, Plaintiff was charged with orchestrating the store opening and her efforts in preparing Morristown for its launch were invaluable.  (O'Malley Dep. 25:13–29:21.)

---

[1]  The parties disagree as to when Plaintiff became the Senior Operations Coordinator. According to Defendant, Plaintiff became the Senior Operations Coordinator in May 2002.  (Def. 56.1 ¶ 22.)  According to Plaintiff, she became the Senior Operations Coordinator in 2001.  (Pl. 56.1 ¶ 22.)

O'Malley was so impressed with Plaintiff's ability to coordinate between the various divisions and her efforts to open the Morristown store successfully and on a timely basis that he saw the Morristown opening as "her success." (O'Malley Dep. 25:13–26:25, 56:6–20.)

In July 2005, Plaintiff was promoted to Senior Merchandise Coordinator and given authority to coordinate the operational functions from the buying offices to all of the branch stores for the Men's, Ladies', Children's, Lingerie, Shoes and Handbags departments. (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.) According to Plaintiff, in this new role she worked with the Buyers, DMMs, and store and department managers. (Pl. 56.1 ¶¶ 256–58, 272–74.) Whenever a particular department's "numbers" were down, I.G. instructed the department's DMM and Coordinator to meet with Plaintiff to review any operational matters contributing to the decline and to partner with Plaintiff to address them. (Pl. 56.1 ¶ 275.) I.G. "made it known to the company's employees that 'if they needed anything to get done' related to operations, 'they should call [Plaintiff].'" (Pl. 56.1 ¶ 276 (citation omitted).) Plaintiff became responsible for training and developing managers at all levels and exercising "dotted-line supervision" over the Coordinators and GSMs, and began spending more time in the stores. (Pl. 56.1 ¶¶ 255–63.) As part of her new role, Plaintiff served to "facilitate dialogue and cooperation among these many actors," and to "bring[] these various individuals together to fashion the necessary solutions." (Pl. 56.1 ¶ 256.) In 2006–2007, Plaintiff's role expanded even further, as she took over for Terri Schoot who had served as Project Coordinator in regard to store openings. (Pl. 56.1 ¶¶ 251, 254–61.)

According to O'Malley, as the GSM of the Morristown store, he relied on Plaintiff as the "person to go to" for the corporate office, with whom he "would interact to figure out solutions" when the store or any of its departments were "not functioning to the standards of the company." (O'Malley Dep. 27:9–15, 54:5–18, 58:4–59:21.) He turned to Plaintiff "on a daily basis," sought

her counsel on personnel matters, and enjoyed "a great working relationship" with her, particularly because of her "ab[ility] to transcend the positive." (*Id.* at 67:8–70:14.)

In each of her Coordinator positions, Plaintiff was responsible for ensuring that I.G.'s directions for merchandising were implemented in the stores and that the presentations in the stores were consistent with company standards. (Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24.) While I.G. supervised Plaintiff, he gave her "a great deal of freedom." (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.) According to Plaintiff, I.G. assigned her "dotted-line supervision" over the other Coordinators, an arrangement that was formalized in mid-August 2010. (Pl. 56.1 ¶ 27.) According to Defendant, I.G. assigned Plaintiff to convey his instructions to the other coordinators beginning in 2006, but she did not formally supervise them. (Def. 56.1 ¶ 27.)

### c. Director of Stores — 2003 to 2008

From October 20, 2003 to October 11, 2008, Jeffrey Jasner was the Director of Stores, one of the top management positions. (Def. 56.1 ¶ 61; Pl. 56.1 ¶ 61.) The Director of Stores exercises operational oversight of each of Defendant's stores, developing a strategic vision for the company and supervising the top person from the human resources department. (Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.) The Director of Stores manages the operations side of the business and reports directly to Raymond. (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56.)

In 2008, Raymond heard a rumor that Jasner had an affair with Cheryl Corigliano, the GSM of Defendant's Brooklyn store. (Def. 56.1 ¶ 73; Pl. 56.1 ¶ 73.) Raymond confronted Jasner, and Jasner denied having any relationship with Corigliano. (Def. 56.1 ¶ 74; Pl. 56.1 ¶ 74.) Raymond later learned that the allegations were true, and Defendant terminated Jasner's employment on the basis of his dishonesty and poor judgment. (Def. 56.1 ¶¶ 73–75; Pl. 56.1 ¶¶ 73–75.) At that time, Defendant was heading into the "all-important fourth quarter," the months between October and December, in which "[f]ailure to meet holiday sales projections

would significantly affect [Defendant's] operations for the coming year." (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77.)

According to Plaintiff, during this period she filled in as Director of Stores. (Pl. Dep. 171:19–173:2, 184:3–185:8.) She "walk[ed] the stores with the general store managers," ensured that the operational calendars were adhered to and that the stores were running operationally, spent more time in the stores, worked with the managers to ensure that they had everything they needed, and collaborated with Raymond on "everything between holiday decorations, holiday timelines, truck deliveries, meeting with vendors, [and] taking over some of the meetings." (*Id.* at 184:3–186:24.) According to Defendant, although Plaintiff may have taken on some of the responsibilities of the position, Plaintiff did not "fill in" as Director of Stores. (R. Gindi Dep. 49:2–51:23.) Instead, Stacy Brasner, the most senior GSM, filled in when the position was vacant. (*Id.*) The parties agree that Plaintiff was never officially named Acting Director of Stores.

Plaintiff claims that after Jasner's termination, she spoke to Raymond and I.G. about becoming Defendant's permanent Director of Stores. Specifically, two days after Jasner was terminated, she told I.G. that she was "ready to step up and take on the responsibility of [D]irector of [S]tores." (Pl. Dep. 171:7–24.) I.G. told her that he needed to ask his brother. (*Id.* at 171:19–24.) Raymond called Plaintiff and emailed her to set up a meeting. (*Id.* at 171:25–172:8.) Plaintiff told Raymond that she was "here to support [them] through this" and "[she]'d really like to talk about becoming [D]irector of [S]tores." (*Id.* at 172:9–17.) Raymond told her that he would speak with his brother, and stated, "Thank you so much for helping us. It is going to be a difficult time. I know you can handle it and won't let anything fall through the cracks."

6

(*Id.* at 172:18–173:6.)  Both Raymond and I.G. deny that Plaintiff ever expressed interest in the Director of Stores position.  (I.G. Dep. 111:20–112:15; R. Gindi Dep. 48:12–49:6.)

####     d.    Interim Director of Stores — 2008 to 2009

After Jasner was terminated, Mark Gittler, a former GSM of the Westbury store, contacted Raymond for a business reference.  (Def. 56.1 ¶ 79–81; Pl. 56.1 ¶ 79–81.)  Gittler had previously been terminated by Defendant for poor performance.  (R. Gindi Dep. 54:17–21, 78:16–84:16; I.G. Dep. 166:12–21.)  Raymond viewed Gittler as having strong analytical skills, the ability to keep within budgets, and the operational background that was a necessary part of serving as the Director of Stores.  (Def. 56.1 ¶ 84.)  In October 2008, Raymond hired Gittler as the Interim Director of Stores because Defendant was heading into the fourth quarter, and Gittler "was available," had previously worked for Defendant, and knew Defendant's employees.  (Def. 56.1 ¶ 85; Pl. 56.1 ¶ 85; R. Gindi Dep. 84:17–88:12.)  Raymond did not consider anyone else for the position because Gittler was available, and he did not feel it was necessary to consider other candidates.  (Def. 56.1 ¶ 87.)  Gittler was hired on an interim basis while Defendent proceeded to interview individuals for the permanent position, but Raymond did tell Gittler that he would have an opportunity to prove himself in the position through the fourth quarter.  (Def. 56.1 ¶¶ 85–86; Pl. 56.1 ¶¶ 85–86; R. Gindi Dep. 87:20–88:12.)

Plaintiff claims that when she learned of Gittler's rehire, she protested to Raymond, because Gittler had previously been terminated for poor work performance and because sexual harassment complaints had been filed against him.[2]  (Pl. Dep. 209:23–210:11.)

---

[2]  According to Plaintiff, a woman had registered a sexual harassment complaint against Gittler while he was serving as GSM of the Westbury store.  (Pl. Dep. 516:9–517:22.)  In addition, one of the Coordinators had filed a complaint with the assistant general manager and the human resources manager of the Westbury store that Gittler had sexually harassed her while

Defendant did not offer Gittler the permanent Director of Stores position, and Gittler's last day as Interim Director of Stores was April 3, 2009.  (Pl. Ex. 33.)  With the Director of Stores position again available, Plaintiff approached I.G. about her interest in the position, and I.G. put her off, this time telling her that in order to earn the position, she just needed to "keep doing what [she] was doing."  (Pl. Dep. 177:2–179:11, 346:2–12.)

### e.    Selection Process of Permanent Director of Stores — 2008 to 2009

Defendant retained DHR International ("DHR"), an executive recruiting firm, to find suitable candidates for the permanent Director of Stores position.  (Def. 56.1 ¶ 88; Pl. 56.1 ¶ 88.) The parties dispute what requirements existed for this position.  According to Defendant, Raymond required that the person holding the Director of Stores position have experience managing large and high volume retail stores, preferably with multiple locations, experience preparing and meeting budgets, the ability to design and implement large scale improvements, proven leadership and motivational skills, and the ability to develop and implement a plan for the growth of the company and the strengthening of its brand.[3]  (Def. 56.1 ¶¶ 58–59.)  Raymond instructed DHR to concentrate on locating candidates with a high level of management experience.  (Def. 56.1 ¶¶ 88–89; Pl. 56.1 ¶¶ 88–89.)  DHR presented a number of male and female candidates to Defendant, and in January 2009, Defendant hired Jim Copeland.[4]  (Def.

---

he was serving as GSM.  (Sewere Dep. 58:2–68:12; *see also* Pl. Dep. 209:23–210:11, 516:9–517:22.)

[3]  Plaintiff argues that there was no established job description for this position, and that these were not the criteria Raymond applied to his decision to hire Mark Gittler for the temporary position in or about November 2008.  (Pl. 56.1 ¶¶ 58–59.)

[4]  Copeland began working at Target Corporation as an intern in college and worked for Target for 14 years.  (Def. 56.1 ¶ 93.)  He served as regional talent leader, store manager, regional operations leader, and district manager.  (*Id.* ¶ 94.)  As district manager he served as the district leader of a $400 million market which included over 2,000 employees.  (*Id.* ¶ 94.)

56.1 ¶¶ 90–92; Pl. 56.1 ¶¶ 90–92.)  Copeland started working as Director of Stores in April 2009.
(Def. 56.1 ¶¶ 90–95; Pl. 56.1 ¶¶ 90–95.)

The parties disagree about the process for selecting the permanent Director of Stores.
Plaintiff alleges that "[t]hough the [Director of Stores] reported directly to Raymond, I.G., as
well as Isaac and Eddie, were as owners deeply involved in the process by which individuals
were considered and hired for the position, interviewing candidates therefore and then providing
Raymond with their input as to who in their respective opinions should be awarded the job."  (Pl.
56.1 ¶ 370; *see also* R. Gindi Dep. 12:12–22, 42:8–19, 112:4–113:6; I.G. Dep. 38:3–42:6, 183–
84; Pl. Dep. 180:22–25).  Defendant alleges that although Raymond sought I.G.'s feedback on
the final candidates, the ultimate decision was his.  (Def. 56.1 ¶ 99; Def. Reply 20–21.)
According to Coordinator Shirley Bigord, because Plaintiff filled in as Director of Stores, she
and DMM Lisa Aqualino wondered why Plaintiff was not awarded the permanent position.
(Bigord Dep. 93:17–95:22.)  Jonathan Schwartz, Defendant's former Chief Information Officer,
testified that he and other directors also wondered why Plaintiff was not given the position.
(Schwartz Dep. 54:4–56:5.)

After Copeland was hired, Plaintiff claims that she again approached I.G. about the
position.  (Pl. Dep. 166:8–167:21.)  Plaintiff said to I.G., "We've discussed before about
becoming Director of Stores, and I need to understand for my business growth what I need to do
to obtain that position.  It's opened several times and you haven't allotted me the opportunity to
go forward with that."  (*Id.* at 167:7–21; *see also id.* at 175:17–180:2.)  I.G. replied, "Lori, you

---

Copeland left Target as regional group director, where he led a $2.1 billion retail operation
covering 8,000 employees in 63 Target stores in Target's third largest U.S. market.  (*Id.* ¶ 95.)
Raymond states that he was impressed with Copeland's ideas for branding the Century 21 image
and creating a positive shopping experience across Defendant's stores.  (R. Gindi Decl. ¶ 25.)

are young, you have young children.  It's a lot of hours.  You don't want the position.  You are the mom." (*Id*. at 167:23–168:2.)  I.G. denies making this statement.  (I.G. Dep. 184:23–186:4.)

### f.  Plaintiff's 2009 Promotions

In April 2009, Plaintiff's role expanded and she was placed in charge of the Purchasing Department.  (Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31.)  In that role, Plaintiff supervised Raymond Kassin, Defendant's Purchasing Buyer, the eleven employees of the purchasing department, and a clerical staff of five employees.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32; Pl. Dep. 140:13–141:18.)  Plaintiff was also responsible for ensuring that Defendant had sufficient supplies and fixtures for the stores. (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32; Pl. Dep. 140:13–141:18.)  For these duties, Plaintiff reported directly to Raymond.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32; Pl. Dep. 98:23–99:20, 104:7–9.)  According to Raymond, Plaintiff's long record of effective performance for Defendant, coupled with her involvement at the time with "fixtures," made her "a good fit" for this "trust level position."  (R. Gindi Dep. 22:15–23:11.)

Plaintiff became the Senior Stores and Merchandise Operations Manager in June 2009.  (Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29.)  On June 2, 2009, Copeland announced Plaintiff's new role, stating that the Coordinators would follow Plaintiff's "leadership and guidance."  (Pl. Ex. 21.)  Plaintiff continued to report to I.G. but also "had a dotted line" to Director of Stores Copeland.  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30.)  According to Plaintiff, in this position her oversight over the Coordinators was officially recognized.  (Pl. 56.1 ¶ 292; *see also* O'Malley Dep. 27:9–28:8; Sewere Dep. 26:18–28:18.)  Plaintiff's interaction with the stores and the GSMs increased, pursuant to Copeland's direction that she "get in the stores" and "fix them" by holding the GSMs more accountable for their operations.  (Pl. Dep. 102:3–104:6, 142:9–145:5, 246:9–25; *see also* Sewere Dep. 31:12–33:6; R. Gindi Dep. 114:1–25.)

### g.   March 2010 Rego Park Opening

In March 2010, Plaintiff assisted with the preparation for the grand opening of Defendant's Rego Park store.  (Def. 56.1 ¶ 108; Def. 56.1 ¶ 108.)  Plaintiff visited the store once or twice a week leading up to the opening.  (Def. 56.1 ¶ 110; Pl. 56.1 ¶ 110.)  Defendant claims that Bruce D'Agata, the store manager for the Rego Park store, began receiving complaints from his staff that Plaintiff would yell at them and intimidate them.  (Def. 56.1 ¶ 110.)  During the first few days of the opening, D'Agata believed that Plaintiff usurped his authority by telling his staff what to do without consulting him.  (Def. 56.1 ¶ 111.)  D'Agata was also told by his employees that Plaintiff gave them conflicting instructions.  (*Id.*)  D'Agata brought these complaints to Copeland and told Copeland that Plaintiff was undermining his authority and was of little assistance.  (Def. 56.1 ¶ 112.)  Copeland discussed these complaints with I.G. and with Plaintiff.  (Def. 56.1 ¶¶ 113–14.)  Copeland told Plaintiff that D'Agata felt that Plaintiff was not letting him run his store and that she was intrusive.  (Def. 56.1 ¶ 114.)

Plaintiff denies D'Agata's allegations that she yelled or intimidated his staff, gave his staff instructions without consulting him, and gave his staff conflicting instructions.  (Pl. 56.1 ¶¶ 110–112.)  According to Plaintiff, her work with regard to the Rego Park opening was strongly praised by Copeland and I.G., and she was rewarded with a $5,000 bonus.  (Pl. 56.1 ¶ 108; *see also id.* ¶¶ 558–562, 565.)  I.G. told her she had done "such a great job" and had "truly worked so hard and really contributed big time" to the Rego Park opening.  (Pl. 56.1 ¶ 558; I.G. Dep 88:12–89:9, 258:4–259:18.)  In Plaintiff's performance evaluation Copeland prepared for the year of the Rego Park opening, Copeland thanked Plaintiff "for [her] leadership on many front[s] including . . . [the] Rego grand opening," and included the opening among Plaintiff's "Accomplishments."  (Pl. Ex. 20.)

### h.   Plaintiff's Performance Reviews

I.G. testified that he "was a fan of" Plaintiff; whatever tasks he gave her, she was good at getting done; he "felt [he] was in good hands" with Plaintiff; he "felt comfortable that she was capable of taking [on] more" responsibility; and he was, during the years Plaintiff reported to him, "happy" with her — in fact, "very happy with her" — and "happy with her performance." (I.G. Dep. 35:24–36:24, 89:2–9, 100:2–101:14, 105:6-107:15, 141:23–142:17, 249:4–12, 251:4–7, 258:4–259:17.)  According to Plaintiff, during I.G.'s annual reviews of her, he would discuss his plans for the company's expansion, the role he envisioned her playing, and her career prospects generally, regarding which he told her the "[s]ky's the limit."  (Pl. Dep. 158:10–164:23.)

Copeland sent Plaintiff emails in June and July 2009 in which he praised her leadership and work on certain projects.  (*Id.*)  For example, on June 2, 2009, he sent her an email stating that he was "very confident in [her] abilities," and on July 13, 2009, he sent her an email stating that her "logical and sequencing approach to everything is awesome and is key to a great deal of things we need to go forward."  (*Id.*)  In his 2009 Performance Review Scorecard dated March 23, 2010, Copeland praised Plaintiff's "leadership on many fronts" and stated her ability to execute is "amazing and continues to be a great strength of [hers] and benefit to the company." (Pl. Ex. 20.)  He noted that it would be important for Plaintiff to "focus [her] energy on Attitude and Teamwork" in order to accomplish her objectives, because as a "Senior Leader," everyone looks to her for a "great attitude even when things become stressful and overwhelming."  (*Id.*) He graded Plaintiff a perfect 10 in each of the "Core Values" of "Accountability," "Proactivity," and "Excellence."  (*Id.*)

In addition to salary increases, Plaintiff received merit-based bonuses.  (I.G. Dep. 100:6–25; R. Gindi Dep. 35:12–17; Pl. Ex. 12.)  According to Coordinator Bigord, her supervisor

DMM Aqualino would urge her to be more like Plaintiff.  (Bigord Dep. 29:9–31:24, 36:3–16, 96:11–19.)  According to Coordinator Sewere, Plaintiff was "very supportive," "a good mentor" and "professional," and she never witnessed Plaintiff "yell[] [at] or be[] unpleasant to people at the company."  (Sewere Dep. 96:2–97:15.)

### i.   Plaintiff's 2010 Promotion

On June 1, 2010, Copeland promoted Plaintiff to the position of Senior Manager of Operations.  (Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.)  In this capacity, Plaintiff reported directly to Copeland and was responsible for implementing and executing the everyday operational needs of the stores and to help grow Defendant through implementing best practices.  (Def. 56.1 ¶¶ 38, 44; Pl. 56.1 ¶¶ 38, 44.)  According to Plaintiff, Copeland emphasized to her that all operational matters would be directed to her, not him, in the first instance.  (Pl. Dep. 109:23–10:8, 561:7–15.)

Copeland initially wanted to hire someone outside Century 21 for the position of Senior Manager of Operations, but I.G. suggested Plaintiff to Raymond, who suggested her to Copeland.  (Def. 56.1 ¶¶ 39–41; Pl. 56.1 ¶¶ 39–41.)  According to I.G., Copeland promoted Plaintiff because "he knew that [I.G.] was . . . very happy with her and . . . valued [I.G.'s] opinion" of Plaintiff, and "thought she would do a good job in her new position."  (I.G. Dep. 190:10–193:25, 216:7–11.)  Defendant claims that Copeland was reluctant to select Plaintiff, as he believed she had difficulty working with people, lacked the ability to build trust and relationships, needed to improve her analytical skills, and was often reactive rather than proactive.  (Def. 56.1 ¶ 42.)  However, Copeland agreed to give Plaintiff "a chance" on the condition that Defendant retain an outside "job coach" to assist Plaintiff in improving her interpersonal skills.  (Def. 56.1 ¶¶ 39–43.)  Plaintiff denies that Copeland was reluctant to

13

promote her and maintains that the "job coach" was a resource and an opportunity that she was offered, not a condition of her promotion.  (Pl. 56.1 ¶¶ 39–43.)

In her role as Senior Manager of Operations, Plaintiff acted as a liason between Copeland, Senior Merchandising Executives and the GSMs, in order to "fully support the implementation of [Defendant's] Mission and Objectives, Best Practices and the execution of operating procedures that Promote and Protect [Defendant's] Brand."  (Pl. Ex. 17.)  Plaintiff also "continue[d] to manage the centralized procurement function and lead vital operations projects that prepare[d] [Defendant] for future growth."  (*Id.*)  The nine coordinators officially began reporting to Plaintiff in August 2010.  (Def. 56.1 ¶ 49; Pl. 56.1 ¶ 49.)  According to Plaintiff, she served as Copeland's "right hand" and was effectively the "Assistant Director of Stores," charged with handling all of the operational aspects of the Director of Stores position, as Copeland sought to shed day-to-day involvement in order to concentrate on "strategic initiatives" geared toward Defendant's growth.  (Pl. 56.1 ¶¶46–48, 294–301.)

### j.   Plaintiff's August 2010 Complaint on Behalf of Corigliano

In August 2010, Copeland asked Corigliano to join him for dinner at a local restaurant. (Def. 56.1 ¶ 139; Pl. 56.1 ¶ 139.)  According to Plaintiff, while Copeland and Corigliano were in a bar following a recent staff dinner and Copeland had "had too much to drink," Copeland told Corigliano that "his birthday was in August and that he was going to go to her store and take her to dinner that evening."  (Pl. 56.1 ¶ 139; Pl. Dep. 232:4–234:13; Pl. Decl. ¶ 21.)  Corigliano contacted Plaintiff at home and conveyed to Plaintiff her discomfort over what she viewed as an untoward overture by Copeland, as well as her desire to avoid it and her fear that doing so would prompt Copeland — who had previously placed her on probation — to terminate her.  (Pl. Dep. 226:6–236:23; Pl. Decl. ¶ 21.)  In discussing these matters with Plaintiff, Corigliano stated that "she['d] already been down that road before" with Jasner and did not "want to go down it again."

14

(Pl. Dep. 234:22–235:9.)  Plaintiff interpreted "that road" to mean a sexual relationship with a supervisor.  (Pl. Decl. ¶ 21.)  Corigliano expressed concern about raising the matter with the human resources department and requested that Plaintiff do so on her behalf.  (Pl. Dep. 228:13–230:24.)  Plaintiff agreed.  (*Id.*)  Defendant claims that Copeland invited Corigliano to dinner in order to discuss company changes, and Copeland had asked each of the six store managers to lunch or dinner on an individual basis to discuss these business issues.  (Def. 56.1 ¶¶ 139–40.)  Defendants further assert that Corigliano told Plaintiff that Copeland had invited her to dinner and requested Plaintiff's opinion as to how she should handle the situation since she had previously lied to the Gindis about her affair with Jasner, and was concerned about how they might perceive her actions.  (Def. 56.1 ¶¶ 141–42.)  According to Corigliano, she never told Plaintiff that she felt harassed by Copeland's request or believed that it was sexual in nature.  (Corigliano Decl. ¶ 9.)

On August 24, 2010, Plaintiff called Jennifer Thoma of the human resources department to report "an issue of potential sexual harassment," and advised her that Copeland had invited Corigliano to dinner and that Corigliano was unsure how she should handle the invitation given her prior affair with Jasner.  (Def. 56.1 ¶ 143; Pl. 56.1 ¶ 143; Pl. Ex. 37.)  Plaintiff claims that she told Thoma that she "hope[d] [she] d[id]n't get fired for telling [Thoma] this."  (Pl. Dep. 237:5–8.)  Defendant claims that Thoma advised Plaintiff that the issue did not appear to involve sexual harassment, and that if Corigliano was uncomfortable, she should decline the invitation.  (Def. 56.1 ¶ 144.)  Thoma also told Plaintiff that Corigliano could speak directly to Thoma if she wanted to discuss the matter further.  (*Id.*)  Thoma did not discuss Plaintiff's report with Copeland until a month later and at that time Copeland "had already known about it."  (Thoma Dep. 89:18–90:25, 93:11–94:7.)

15

In or about the end of August 2010, Corigliano contacted Raymond directly to discuss Copeland's invitation. (Def. 56.1 ¶ 145; Pl. 56.1 ¶ 145.)  Raymond advised Corigliano that Copeland was inviting all of the GSMs to one-on-one dinners. (Def. 56.1 ¶ 146; Pl. 56.1 ¶ 146.) Raymond told Corigliano that he did not see a problem with the invitation but that she could simply decline the invitation if she felt uncomfortable. (Def. 56.1 ¶ 147; Pl. 56.1 ¶ 147.) Corigliano did not mention Plaintiff during this discussion. (Def. 56.1 ¶ 147; Pl. 56.1 ¶ 147.) Based on her conversation with Raymond, Corigliano accepted Copeland's invitation and had dinner with him without incident. (Def. 56.1 ¶ 148; Pl. 56.1¶ 148.)

According to Plaintiff, at the dinner, Copeland told Corigliano that they should "get the elephant out of the room.  I'm not Jeff Jasner and what happened with Jeff Jasner has no basis of happening with me." (Pl. Dep. 239:19–40:19.)  Plaintiff argues that "immediately after she lodged the complaint [with Thoma], what had until then been a warm and positive relationship between she and Copeland utterly disintegrated, with Copeland abruptly at that point turning mean and hyper-critical toward [P]laintiff and condemning her to Raymond and then to I.G. as a performer so poor as to warrant discharge." (Pl. Opp'n 17.)

### k.   August 2010 Complaints about Plaintiff

According to Defendant, in mid-August 2010, David D'Amico, the Director of New Store Development and Construction, approached Copeland and expressed his view that Plaintiff was ruining the organization, especially since she had become Senior Manager of Operations. (Def. 56.1 ¶ 123; Copeland Decl. ¶ 35.)  D'Amico told Copeland that Plaintiff took credit for things she did not do, told lies, and misrepresented the facts. (Def. 56.1 ¶ 123; Copeland Decl. ¶ 35.)  D'Amico threatened to quit the company if something was not done about Plaintiff. (Def. 56.1 ¶ 124; Copeland Decl. ¶ 35.)  Plaintiff argues that these alleged complaints "were never contemporaneously memorialized," "were unsupported by even a single specific as to

[P]laintiff's allegedly offending conduct," and were never brought to her attention.  (Pl. 56.1 ¶¶ 123–24.)  Plaintiff denies that she was "ruining the organization," and claims that D'Amico is not credible.  (*Id.*)

At approximately the same time, Thomas Carhart, General Store Manager of the Paramus store, also approached Copeland and complained about the way Plaintiff treated his Assistant Store Managers who were afraid of her because of her connection with I.G.  (Def. 56.1 ¶ 125; Copeland Decl. ¶ 36.)  Copeland received similar complaints from Nikki Carpenter, one of the Coordinators, that Plaintiff was rude, talked down to people, including the Coordinators, and used her relationship with I.G. to inspire fear.  (Def. 56.1 ¶ 126; Copeland Decl. ¶ 36; *see also* Carpenter Decl. ¶ 5.)  Plaintiff argues that these alleged complaints, like the others, were never contemporaneously memorialized or brought to her attention.  (Pl. 56.1 ¶¶125–26.)  Plaintiff notes that one of Carpenter's criticisms, that Plaintiff was harsh, rude, and "talked down to" people including the Coordinators, is inconsistent with Coordinator Shirley Bigord's testimony of having "a very good relationship with Plaintiff."  (Bigord Dep. 10:18–12:23.)

In late August 2010, Corigliano told Copeland that Plaintiff could not be trusted and that she was only friendly with Plaintiff because she knew there would be hell to pay if she got on Plaintiff's bad side.[5]  (Def. 56.1 ¶ 127; Copeland Decl. ¶ 40.)  Similar concerns were raised to Thoma by several coordinators who complained of having to report directly to Plaintiff, and Thoma conveyed those concerns to Copeland.  (Def. 56.1 ¶ 128; Thoma Decl. ¶¶ 6–8.)  Plaintiff argues that these complaints were also never contemporaneously memorialized, were unsupported by specific details and were never brought to her attention.  (Pl. 56.1 ¶¶ 127–28.)

---

[5]  It is unclear whether Corigliano made this statement before or after she allegedly asked Plaintiff to speak to Thoma on her behalf.

According to Defendant, Copeland was aware from his own observations that Plaintiff had communication, leadership and teamwork issues, but it was not until he began receiving these complaints that he became aware of the extent of the problem.  (Def. 56.1 ¶ 129.) Defendant claims that it was not until Copeland began supervising Plaintiff directly that other employees felt comfortable voicing their complaints and concerns about Plaintiff.  (*Id.* ¶ 129.)

On August 18, 2010, Plaintiff met with Rocco Montesano, Westbury General Store Manager, about reports she had received that Montesano was having an affair with the Cosmetics Manager and that the affair was disrupting operation of the Cosmetics Department.  (Pl. 56.1 ¶ 462.)  Plaintiff claims she was sent to the meeting at Copeland's direction, (*id.*), but Copeland claims that, although he knew about the meeting, Plaintiff elected to meet with Montesano on her own.  (Copeland Dep. 141:2–144:22.)  Plaintiff advised Copeland of Montesano's hostile and defensive response during the meeting, and that Montesano was generally difficult to work with. (Pl. 56.1 ¶¶ 466–79.)  Between approximately August 22–25, 2010, Montesano advised Raymond that he could no longer work with Plaintiff, whom he described as a "cancer on Century 21."  (Def. 56.1 ¶¶ 130–31; Pl. 56.1 ¶¶ 130–31, 480; *see also* Montesano Decl. ¶¶ 6–8; R. Gindi Decl. ¶ 38.)  Montesano claims that Plaintiff was not a "team player," would "blow minor issues out of proportion and scream at managers and associates," and "would disrespect [him] and other members of store management on a regular basis."  (Montesano Decl. ¶ 2.) Plaintiff argues that Montesano's complaints were not legitimate, and that Montesano and his staff never raised these issues with her or filed complaints against her, and that she was never counseled or reprimanded for any misbehavior.  (Pl. 56.1 ¶¶ 492–93, 502, 513–15.)

Defendant asserts that although Raymond had previously been aware that Plaintiff was difficult to work with, Montesano's complaint reflected a much larger problem.  (Def. 56.1

18

¶ 132.)  Following his conversation with Montesano, Raymond spoke with other Century 21 employees who corroborated what he learned from Montesano.  (Def. 56.1 ¶ 133.)  For example, D'Amico told Raymond that he had "run-ins" with Plaintiff, and she was very difficult to work with.  (*Id.* ¶ 134.)  Director of Loss Prevention James Betesh advised Raymond that Plaintiff treated people poorly and she did not know what she was talking about.  (*Id.*)  Carhart, the GSM of the Paramus store, told Raymond that he was afraid of Plaintiff and feared retribution by her. (*Id.*)  Alan Shrem, an assistant store manager, advised Raymond that he agreed with Montesano about Plaintiff and that morale was low for the people that worked with her.  (Def. 56.1 ¶ 134.) Plaintiff argues that these reports were general complaints and that they did not contain allegations of specific conduct.  (Pl. 56.1 ¶¶ 494, 495; *see also* Pl. Opp. Mem. 20 n.23.) Raymond met with Copeland to discuss what to do about Plaintiff.  (Def. 56.1 ¶ 135; Pl. 56.1 ¶ 135.)  Raymond and Copeland discussed various options, including termination, but decided to wait until after Labor Day when they could meet with I.G., who was a strong supporter of Plaintiff.  (Def. 56.1 ¶ 135; Pl. 56.1 ¶ 135.)

As part of his supervision of Plaintiff, Copeland met with Plaintiff regularly.  (Def. 56.1 ¶ 136; Pl. 56.1 ¶ 136.)  At a meeting on August 31, 2010, Copeland criticized Plaintiff's leadership and informed her that her position was in jeopardy.  (Def. 56.1 ¶ 137; Pl. 56.1 ¶ 137.) He requested that she return with a plan to correct her behavior.  (Def. 56.1 ¶ 138; Pl. 56.1 ¶ 138.)  Plaintiff admits that these sentiments were expressed but asserts that Copeland's critiques were not warranted.  (Pl. 56.1 ¶ 137.)  Plaintiff also disputes that Copeland ever asked her for a plan to correct her behavior.  (Pl. 56.1 ¶ 158.)  According to Plaintiff, until this point, Copeland had voiced no criticism of Plaintiff and there is no record of his alleged dissatisfaction prior to her "sexual harassment complaint against him on behalf of Corigliano."  (Pl. 56.1 ¶ 137.)

To the contrary, Copeland had been highly complimentary of Plaintiff's leadership abilities. (*Id.*)

After Labor Day, Raymond and Copeland met with I.G. to discuss Plaintiff and told I.G. about Raymond's meeting with Montesano and his conversations with other employees.  (Def. 56.1 ¶ 150; Pl. 56.1 ¶ 150.)  I.G. recognized the serious nature of the issue but believed that, because of Plaintiff's long history with the company, they should give her another chance to see if the problems could be improved.  (Def. 56.1 ¶ 151; Pl. 56.1 ¶ 151.)  Raymond and Copeland decided Copeland should put Plaintiff on probation and tell her of the serious concerns regarding her performance that she would have to rectify to keep her job.  (Def. 56.1 ¶ 152; Pl. 56.1 ¶ 152.) I.G. agreed.  (Def. 56.1 ¶ 152; Pl. 56.1 ¶ 152.)  According to Defendant, at the time of this decision, neither Raymond nor Copeland was aware that Plaintiff had spoken with Thoma regarding Corigliano.  (Def. 56.1 ¶ 153.)  Plaintiff disputes this fact.  (Pl. 56.1 ¶ 153.)

### l.   Plaintiff's Performance Improvement Plan

Following the meeting, Thoma and Copeland prepared a 90-day performance improvement plan ("PIP") for Plaintiff.  (Def. 56.1 ¶ 156; Pl. 56.1 ¶ 156.)  The goals outlined were organized around five core values and consisted of improving Plaintiff's accountability, attitude, teamwork, proactivity, and excellence.  (Def. 56.1 ¶ 157; Pl. 56.1 ¶ 157.)  Plaintiff asserts that there was no cause to improve her performance and that the motivating reason for the PIP was retaliation for her speaking to Thoma about the sexual harassment issue on behalf of Corigliano.  (Pl. 56.1 ¶ 157.)

On September 14, 2010, Copeland met with Plaintiff and, according to Defendant, told her that he was disappointed that she had not provided him with a plan to correct her behavior and build better relationships and trust with the managers.  (Def. 56.1 ¶ 158.)  According to Plaintiff, Copeland requested a plan on "how she viewed her role in the company and how she

intended to execute her responsibilities in stores," and she submitted a plan that addressed those matters. (Pl. 56.1 ¶ 158; *see also* Pl. Ex. 35.) Copeland told Plaintiff he was not pleased with her work on certain projects, including the weekly newsletter,[6] a new store signage program,[7] the fitting room stool bids,[8] the "Email Pads" project,[9] and the cleanup of the 700 building, an e-

---

[6] Plaintiff was assigned to create a weekly newsletter that was "intended to be a focused communication tool for the stores." (Def. 56.1 ¶ 160.) According to Copeland, the newsletter Plaintiff created lacked a uniform format, had typographical errors, was confusing, and generally lacked the type of professional appearance that Copeland expected. (*Id.*) According to Plaintiff, the newsletter had actually been the source of praise by its recipients. (Pl. 56.1 ¶ 613; Pl. Dep. 366:11–12.) Thoma send her an email stating "That is great Lori!," (Pl. Ex. 54), and Copeland sent an email stating "Great kick-off! That is what we needed!," (Pl. Ex. 21). Copeland also congratulated Plaintiff on her receipt of recognition of her newsletter from others. (Pl. Ex. 54.) Plaintiff argues that, although Copeland proclaimed to be dissatisfied with the newsletter ever since its creation, Copeland never criticized Plaintiff for her efforts with regard to the newsletter or directed her to alter the newsletter, and had approved each weekly newsletter in advance of its release. (Def. 56.1 ¶ 616.)

[7] According to Defendant, Plaintiff was responsible for obtaining a new vendor to work with Defendant to produce signs for all of the stores, but Copeland had not seen any information on the vendor, materials, or scope of the project. (Def. 56.1 ¶ 161.) Plaintiff worked on the signage program with the IT department. (Pl. 56.1 ¶ 625.) Peter Heil, a salesman who had represented the program's vendor on the project, testified that the project ran into technological problems, and that the fault lay with Defendant's IT department, not with Plaintiff. (Heil Dep. 13:6–54:17, 61:18–23.)

[8] Plaintiff disputes that the fitting room stools project was ever assigned to her. (Pl. 56.1 ¶ 598.) The project was assigned to and managed by Purchasing Buyer Kassin, an employee named Virginia Moraweck and D'Amico, the Director of New Store Development and Construction. (Pl. 56.1 ¶ 599.) When Plaintiff was accused of neglecting this project as part of her probation, she contacted D'Amico and learned that the project had not even been approved. (Pl. 56.1 ¶ 603.) Copeland admitted during his deposition that the fitting room stools project was managed by others. (Copeland Dep. 186:23–187:25.)

[9] Copeland criticized Plaintiff's poor performance regarding the "Email Pads" project. (Pl. Ex. 48.) It is unclear from the record what this project was or what was inadequate about Plaintiff's performance. According to Plaintiff, Copeland had expressed his satisfaction with Plaintiff's work on this project verbally and in writing prior to these criticisms. (Pl. Dep. 442:24–443:10; Pl. Ex. 56.)

commerce warehouse.[10]  (Def. 56.1 ¶ 159.)

According to Defendant, after Copeland shared his concerns, Plaintiff began to object to

the manner in which Copeland conveyed this information and expressed her belief that Copeland

was not partnering with her or supporting her and nothing he said was positive.  (Def. 56.1

¶ 163.)  Plaintiff asserts that she did not respond defensively, but that, to the contrary, her

complaints were caused by Copeland's "contriving critiques," cutting off contact with her, and

verbally abusing her when they did interact.  (Pl. 56.1 ¶ 163.)  Plaintiff told Thoma, I.G. and

Raymond about this sudden and severe shift by Copeland, and notes that it occurred only after

her complaint on behalf of Corigliano against Copeland.  (Pl. 56.1 ¶ 163.)[11]

### m.   Meeting Regarding the PIP

On September 28, 2010, Copeland and Thoma met with Plaintiff to advise her that her

performance was not up to Defendant's standards and placed her on probation.  (Def. 56.1 ¶ 165;

Pl. 56.1 ¶ 165.)  According to Plaintiff, prior to this meeting, Plaintiff met with Thoma, and

---

[10]  Plaintiff and others were assigned to clear a portion of the 700 building, a warehouse and distribution center.  (Pl. Dep. 361:21–363:10.)  Copeland had learned from Thoma that Plaintiff acted like a tyrant in supervising this project, yelling and screaming at employees and belittling them.  (Def. 56.1 ¶¶ 159–62.)  Plaintiff disputes that she acted in this manner and argues that she was never criticized for her conduct in connection with this project at the time it occurred.  (Pl. 56.1 ¶ 162.)  To the contrary, the warehouse director Al Kyle wrote an email to Copeland, I.G. and Raymond stating:

> Lori Ellis is truly amazing. She worked so hard on coordinating and following up on clearing out the fixtures and trash, and then coming over at the end of last week to make sure that the north 40,000 sq feet of the 700 building [i.e. the warehouse] was clean and the south 60,000 was reorganized. This was a major task and she got it done within the timeframe allotted. I was shocked when I saw the progress yesterday. Lori is #1 in my book.

After receiving this email, I.G. replied that Plaintiff had done a "[g]reat job!!!"  (*Id.*)

[11]  On September 21, 2010, Plaintiff's administrative assistant, Christina Coloreo, resigned from Century 21.  (Def. 56.1 ¶ 164; Pl. 56.1 ¶ 164.)  Plaintiff claims Coloreo departed for a significant raise in pay.  (Pl. 56.1 ¶ 164.)  According to Defendant, Coloreo left because of the way Plaintiff treated her.  (Def. 56.1 ¶ 164.)

Thoma gave her a "heads-up" that Copeland wanted to speak with her.  (Pl. 56.1 ¶ 166.)  The day

before, Plaintiff had "set out in writing for Thoma the difficulties [she] had been experiencing

with Copeland since having raised Corigliano's sexual harassment concerns about him," and

Plaintiff "assumed [that] it was about those difficulties" that Copeland wanted to meet with her.

(Pl. Decl. ¶ 25.)  Since Copeland's "behavior toward [P]laintiff had changed so markedly for the

worse after having complained about him at the behest of someone else, and in light of his

tendency to generally fly off the handle with others . . . [Plaintiff] gr[e]w fearful as to how he

would respond now that [she] had complained about him on [her] own behalf" regarding his

treatment following her complaint on behalf of Corigliano, so she decided that, before meeting

with him, she would discuss the situation with I.G.  (Id.)  Plaintiff met with I.G. and Thoma and

discussed the abrupt deterioration of Copeland's treatment of her, and how Copeland's

allegations were baseless and "outright ludicrous" in light of her performance under I.G.  (Pl.

56.1 ¶ 167.)

   According to Defendant, when Thoma advised Plaintiff that Thoma and Copeland would

be meeting with Plaintiff to review her performance issues and areas that Copeland wanted to see

improved, Plaintiff became upset, calling Copeland a "mother f***er," and demanded to see I.G.

(Def. 56.1 ¶ 166.)  During the meeting with I.G. and Thoma, Plaintiff stated that she did not

understand how she could not be doing a good job after 13 years and wanted to return to working

for I.G.  (Def. 56.1 ¶ 167.)

   During the September 28, 2010 meeting with Copeland and Thoma, Plaintiff was given a

copy of the PIP and advised that she needed to improve her performance to avoid termination.

(Def. 56.1¶ 168; Pl. 56.1 ¶ 168.)  Plaintiff claims that Copeland read the document out loud and

refused her request for details, examples or the identities of those she had "issues" with.  (Pl.

56.1 ¶ 169.)  According to Defendant, Copeland reviewed several examples of what he viewed as Plaintiff's unsatisfactory performance, including the trust and conflict issues with the GSMs, Coordinators, and key senior leaders, and her failure to take accountability for or learn from her mistakes.  (Def. 56.1 ¶ 169.)  Copeland also told Plaintiff that her performance on certain projects was unacceptable.  (*Id.* ¶ 170.)  Plaintiff refused to sign a copy of the PIP.  (Def. 56.1 ¶ 171; Pl. 56.1 ¶ 171.)  Plaintiff asserts that she exercised her right to not sign the document because she disputed the grounds on which it was based.  (Pl. 56.1 ¶ 171.)  However, Copeland ultimately strong-armed her into signing the document by threatening her with termination if she did not sign it.  (*Id.*)  Copeland viewed Plaintiff's initial refusal to sign the PIP as an example of Plaintiff's refusal to take responsibility for her own shortcomings.  (Def. 56.1 ¶ 171.)  He believed Plaintiff had a difficult time accepting constructive criticism and making the requested changes.  (*Id.* ¶ 172.)  He viewed her performance as continuing to deteriorate after she was put on probation.  (*Id.*)

Plaintiff asserts that Copeland requested changes out of retaliation but she nonetheless worked diligently to comply with Copeland's requirements.  (Pl. 56.1 ¶ 172.)  Copeland offered her no constructive criticism, and her performance did not continue to deteriorate since it had never been deficient.  (*Id.*)  Plaintiff believes Copeland was not happy with anything she did after she raised the issue about him asking Corigliano to dinner with Thoma of the human resources department, in contrast to his prior satisfaction with her work, and that he embarked on a course of retaliation leading to her termination.  (Pl. 56.1 ¶ 173.)  Plaintiff asserts that Copeland isolated her by canceling store visits and business meetings with her and refusing to return her calls.  (Pl. 56.1 ¶ 630.)  In one instance, Copeland did not return several of Plaintiff's calls, did not respond to her email requesting a meeting, told her he did not have time to meet when she visited in

person, and cancelled her scheduled meeting, and then criticized her for not obtaining his approval on a "sign shop manual" before passing it along.  (Pl. Ex. 59.)  When Copeland did meet with Plaintiff to "touch-base" on her progress, the meetings "played out as what [P]laintiff came to call 'beatdowns.'"  (Pl. 56.1 ¶ 630.)

According to Defendant, Plaintiff never acknowledged that she was in an entirely different role, reporting to a different supervisor who had different expectations and continued to go to I.G. with problems or complaints after he stopped supervising her.  (Def. 56.1 ¶ 176.) Plaintiff asserts that she understood her new role, how it differed, who her new direct supervisor was, and what the expectations were of her.  (Pl. 56.1 ¶ 176.)  She claims that she continued to meet with I.G. because she continued to report to him on certain projects and that it was only on September 28, 2010, that she specifically approached I.G. regarding her issues with Copeland. (Pl. 56.1 ¶ 176.)

### n.   Plaintiff's Medical Leave

On September 29, 2010, Thoma received a doctor's note excusing Plaintiff from work through October 1, 2010.  (Def. 56.1 ¶ 177; Pl. 56.1 ¶ 177.)  Plaintiff states that she worked from home during this time.  (Pl. 56.1 ¶ 207.)  Plaintiff thereafter remained out of work on the advice of her doctors until November 1, 2010, when Plaintiff returned to work.  (Def. 56.1 ¶¶ 177–79; Pl. 56.1 ¶ 178.)  Plaintiff claims that she missed work because she was anxious regarding Copeland's abusive treatment.  (Pl. 56.1 ¶ 177.)

### o.   Plaintiff's Complaints Against Copeland

Plaintiff complained to Thoma that Copeland was treating her unfairly, and Thoma began an investigation into Plaintiff's allegations.[12]  (Def. 56.1 ¶ 208; Pl. 56.1 ¶ 208.)  While Thoma was conducting this investigation, she received a letter from Plaintiff's attorney, dated October 28, 2010, alleging that Plaintiff was discriminated against as a result of her gender and retaliated against for her complaint against Copeland on behalf of Corigliano.  (Pl. Ex. 61.) Thoma interviewed 29 employees and reviewed numerous documents as part of her investigation.  (Thoma Decl. ¶ 41.)  Plaintiff declined to be interviewed.  (*Id.*)  Thoma concluded that there was no evidence to support Plaintiff's allegations that she was harassed or retaliated against by Copeland, was denied a promotion to Director of Stores, or was discriminated against on the basis of her gender.  (Def. 56.1 ¶ 212.)

According to Plaintiff, she declined to be interviewed because of the "inherent conflict of interest" arising out of "any effort by [Thoma] to investigate her direct supervisor" Copeland. (Pl. Decl. ¶ 38.)  Plaintiff challenges the investigation on three grounds:  (1) the investigation report was created after Plaintiff had initiated legal proceedings against Defendant at the Equal Employment Opportunity Commission, (2) the report was based on "witness statements" that were not supported by primary materials, and (3) the witness statements are not credible, as the statement attributed to Carpenter has been refuted by Carpenter herself, the D'Agata statement regarding the Rego Park opening is inaccurate, and the statement attributed to Chandra Santiago must have been fabricated because Santiago denies being interviewed.  (Pl. 56.1 ¶ 210.)

---

[12]  According to Plaintiff, immediately after Copeland told her that her career was in jeopardy, she began reporting Copeland's mistreatment to Thoma.  (Pl. 56.1 ¶ 208; Pl. Dep. 288:12–289:12.)  According to Defendant, Plaintiff's complaints began after she was advised that she was going to be placed on probation.  (Def. 56.1 ¶ 208.)

### p.   November 2010 Review

Plaintiff met with Raymond and Thoma at the beginning of November 2010.  (Def. 56.1 ¶ 192; Pl. 56.1 ¶ 192.)  According to Plaintiff, she explained Copeland's mistreatment of her following her conversation with Thoma regarding the sexual harassment issue on behalf of Corigliano.  (Pl. 56.1 ¶ 193.)  Raymond asked Plaintiff if she had known that Copeland had taken all of his GSMs to dinner, and she replied that she had not.  (*Id.*)  Plaintiff then reviewed her employment history with Defendant, including her promotions and positive reviews, and asked Raymond how she was suddenly subjected to numerous criticisms and placed on a 60-day performance warning.  (*Id.*)  During the meeting, Plaintiff did not acknowledge that she needed to improve her performance, because she felt the criticisms were retaliatory and fabricated, rather than genuine feedback.[13]  (Pl. 56.1 ¶ 194.)

On November 8, 18, and 23, 2010, Copeland and Thoma met with Plaintiff to discuss her performance and probationary goals.  (Def. 56.1 ¶ 199; Pl. 56.1 ¶ 199.)  Plaintiff asserts that these meetings merely consisted of Copeland summarily condemning everything she did, ignoring her requests for particulars, and browbeating her.  (Pl. 56.1 ¶ 199.)  Defendant asserts that during these meetings, Copeland reviewed Plaintiff's projects in detail and provided her with feedback.  (Def. 56.1 ¶ 199.)  At the November 8, 2010 meeting, Copeland expressed his disappointment in the weekly newsletter as it did not look professional, and noted that the new store sign project did not occur on a timely basis.  (Def. 56.1 ¶¶ 202–03.)  Plaintiff asserts that Copeland's dissatisfaction with the newsletter was not genuine since he had not previously complained, and that the signage program was delayed because Copeland himself required more

---

[13]  Defendant contrasts Plaintiff's reaction to that of Corigliano.  Corigliano had also been placed on a PIP, but after making a sincere effort to improve her performance, Corigliano was taken off her PIP and promoted to General Store Manager of Defendant's Brooklyn store.  (Def. 56.1 ¶¶ 197–98.)  Plaintiff disputes that these situations can be compared.  (Pl. 56.1 ¶ 195–98.)

time to review and approve part of the project.  (Pl. 56.1 ¶¶ 202–03.)  At the November 18, 2010

meeting, Copeland stated he did not like Plaintiff's format for the presentation of the stockroom

standards project and that it was months behind schedule.  (Def. 56.1 ¶ 204.)  According to

Plaintiff, the project was completed prior to the meeting and the format was modeled on an

appraisal form created by Copeland.  (Pl. 56.1 ¶ 204.)  At the November 28, 2010 meeting,

Copeland told Plaintiff that he thought her leadership skills in overseeing the preparation of the

merchandise manuals was poor and that the manuals needed to be more structured and

organized.  (Def. 56.1 ¶ 205.)  According to Plaintiff, Copeland himself had ordered that the

project be placed on hold, but had approved the portion of the book that was already prepared.

(Pl. 56.1 ¶¶ 200(b), 205.)

### q.   Plaintiff's Termination

By the beginning of December, Copeland concluded that he did not believe that Plaintiff

had satisfactorily improved her performance or met her probationary goals.  (Def. 56.1 ¶ 206.)

However, Defendant was willing to extend Plaintiff's probationary period as she had been out of

work for medical issues.  (*Id.*)  Plaintiff declined the extension, (Def. 56.1 ¶ 207; Pl. 56.1 ¶ 207),

because she felt it was unnecessary since she had worked from home during those absences, (Pl.

56.1 ¶ 207.)

Plaintiff was terminated on December 17, 2010.  (Def. 56.1 ¶ 213; Pl. 56.1 ¶ 213.)

Plaintiff argues that Copeland's decision was in retaliation for her speaking to Thoma on behalf

of Corigliano.  (Pl. 56.1 ¶ 214.)  According to Defendant, Copeland decided to terminate Plaintiff

because she failed to improve her performance and failed to take responsibility for her actions

and deficiencies in work product.  (Def. 56.1 ¶ 214.)

In May 2011, Copeland left Defendant's employ for personal reasons.  (Def. 56.1 ¶ 102;

Pl. 56.1 ¶ 102.)  After reviewing a number of candidates, Defendant offered the job to Karen

Peters, who was Senior Vice President and Director of Stores at Saks Off Fifth Avenue Outlet

Stores.  (Def. 56.1 ¶ 104; Pl. 56.1 ¶ 104.)  Peters accepted the position, but after Saks made a

counteroffer, she decided to remain at Saks.  (Def. 56.1 ¶ 105; Pl. 56.1 ¶ 105.)  Defendant then

hired Larry Mentzer, the District Vice President of Macy's Metro NYC District.  (Def. 56.1

¶ 106; Pl. 56.1 ¶ 106.)

## II.   Discussion

### a.   Standard of Review

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Kwong v. Bloomberg*,

--- F.3d ---, ---, 2013 WL 3388446, at *4 (2d Cir. July 9, 2013); *Redd v. N.Y. Div. of Parole*, 678

F.3d 166, 174 (2d Cir. 2012).  The role of the court is not "to weigh the evidence and determine

the truth of the matter but to determine whether there is a genuine issue for trial."  *Cioffi v.

Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue of fact exists when there is

sufficient "evidence on which the jury could reasonably find for the plaintiff."  *Anderson*, 477

U.S. at 252.  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary

judgment; "there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.*

The court's function is to decide "whether, after resolving all ambiguities and drawing all

inferences in favor of the non-moving party, a rational juror could find in favor of that party."

*Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).  The Second Circuit has "cautioned

that '[w]here an employer acted with discriminatory intent, direct evidence of that intent will

only rarely be available, so affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination.'"  *Taddeo v. L.M. Berry &*

*Co.*, --- F. App'x ---, ---, 2013 WL 1943274, at *1 (2d Cir. May 13, 2013) (quoting *Gorzynski v.*

*JetBlue Airways Corp.*, 596 F. 3d 93, 101 (2d Cir. 2010)).

### b.   Gender Discrimination

Plaintiff claims that Defendant failed to promote her to the Director of Stores position in

October 2008 because of her gender in violation of Title VII, NYSHRL and NYCHRL.[14]  Title

VII prohibits an employer from discriminating "against any individual with respect to [her]

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a)(1).  Thus, "[a]n employment

decision . . . violates Title VII when it is 'based in whole or in part on discrimination.'"

*Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) (quoting *Feingold v. New York*, 366

F.3d 138, 152 (2d Cir. 2004)).

Title VII claims are assessed using the burden-shifting framework established by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[15]  *See Dowrich-*

---

[14]   In her Complaint, Plaintiff claimed that she was denied the promotion on two occasions: (1) in October 2008 when Defendant hired Gittler on an interim basis, and (2) in March 2009 when Defendant hired Copeland.  In her memorandum in opposition to Defendant's motion, however, Plaintiff clarified that she should have been hired instead of Gittler in October 2008.  (Pl. Opp'n 36–37, 49.)  Had she been hired instead of Gittler, she would have been given the opportunity, as Gittler was, of proving herself and transitioning into the permanent position. (*Id.*)  Thus, Plaintiff does not argue that she should have been hired instead of Copeland. Instead, she argues that Copeland never should have been considered.

[15]   The burden of proof and production for employment discrimination claims under Title VII and the NYSHRL are identical.  *Hyek v. Field Support Servs., Inc.*, 461 F. App'x 59, 60 (2d Cir. 2012) ("Claims brought under the NYSHRL 'are analyzed identically' and 'the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII.'" (alteration in original) (quoting *Smith v. Xerox Corp.*, 196 F.3d 358, 363 n. 1 (2d Cir. 1999)).  Therefore, Plaintiff's Title VII and NYSHRL discrimination claims are analyzed together for purposes of this motion.  "[C]ourts in this circuit have yet to adopt a test for analyzing failure to promote claim made under the broader and more liberal NYCHRL."  *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 679 (S.D.N.Y. 2012) (citing *Campbell v. Cellco Partnership*, 860 F. Supp. 2d 284, 297–98), *appeal dismissed*, (Aug. 14, 2012); *see generally*

*Weeks v. Cooper Square Realty, Inc.*, --- F. App'x ---, ---, 2013 WL 4437071, at *1 (2d Cir.

August 21, 2013) (applying *McDonnell Douglas* framework to gender discrimination claim); *Yu*

*v. New York City Hous. Dev. Corp.*, 494 F. App'x 122, 125 (2d Cir. 2012) (applying *McDonnell*

*Douglas* framework to failure to promote claim).  Under the framework, a plaintiff must first

establish a prima facie case of discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506

(1993); *see also Dowrich-Weeks*, --- F. App'x at ---, 2013 WL 4437071 at *1.  Plaintiff's burden

at this stage is "minimal."  *Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506).  If

Plaintiff satisfies this initial burden, the burden then shifts to Defendant to articulate a legitimate,

nondiscriminatory reason for its actions.  *Hicks*, 509 U.S. at 506–07; *Ruiz v. County Of*

*Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).  Defendant's burden "is not a particularly steep

hurdle."  *Hyek v. Field Support Servs.*, 702 F. Supp. 84, 93 (E.D.N.Y. 2010).  It "is one of

production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson*

*Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Hicks*, 509 U.S. at 509).  If Defendant

offers a legitimate, nondiscriminatory explanation for its action, summary judgment must still be

denied, however, if Plaintiff can show that "the evidence in plaintiff's favor, when viewed in the

light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that [the adverse

employment action] was motivated at least in part by [gender] discrimination."  *Adamczyk v.*

*N.Y. Dep't of Corr. Servs.*, 474 F. App'x 23, 25 (2d Cir. 2012) (quoting *Tomassi v. Insignia Fin.*

---

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 108–09 (2d Cir. 2013)
(explaining that the NYCHRL requires that "its provisions 'be construed liberally for the
accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether
federal or New York State civil and human rights laws . . . have been so construed'" (quoting
N.Y.C. Admin. Code § 8–130)).  Therefore, this Court will use the Title VII and NYSHRL
standards as a guide in analyzing Plaintiff's NYCHRL failure to promote claim, while "keeping
the NYCHRL's more liberal standards in mind."  *Davis-Bell*, 851 F. Supp. 2d at 679; *see also*
*Campbell*, 860 F. Supp. 2d at 297–98.

*Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2522–23 (2013) ("An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act.  So-called but-for causation is not the test.  It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."); *Edwards v. Huntington Union Free Sch. Dist.*, No. 11-CV-1408, 2013 WL 3785620, at *5 (E.D.N.Y. July 18, 2013) (explaining the burden shifting analysis for Title VII claims).

Defendant argues that Plaintiff cannot establish that she had the necessary qualifications for the position, and, even if she could establish her qualifications, she cannot show that the hired individual was less qualified.  (Def. Mem. 27–32.)  For the following reasons, viewing all the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented sufficient evidence from which a reasonable jury could find that Plaintiff suffered gender discrimination based on Defendant's failure to promote her to the temporary Director of Stores position in October 2008.

### i.  Plaintiff's Prima Facie Case

To establish a prima facie case of employment discrimination based on a failure to promote claim under Title VII, a plaintiff must show that (1) she is a member of a protected class, (2) she applied and was qualified for a position for which the employer was seeking applicants, (3) she was not selected for the position, and (4) that the failure to promote occurred under circumstances giving rise to an inference of discriminatory intent.  *See Yu*, 494 F. App'x at 124–25; *Tanvir v. N.Y.C. Health & Hosps. Corp.*, 480 F. App'x 620, 621 (2d Cir. 2012); *Lomotey v. Conn.–Dep't of Transp.*, 355 F. App'x 478, 480 (2d Cir. 2009); *Sandor v. Safe*

*Horizon, Inc.*, No. 08-CV-4636, 2011 WL 115295, at *8 (E.D.N.Y. Jan. 13, 2011).  "Although plaintiff's burden at the prima facie stage is minimal, [s]he must provide some competent evidence that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  *Dent v. U.S. Tennis Ass'n*, No. 08-CV-1533, 2011 WL 308417, at *4 (E.D.N.Y. Jan. 27, 2011).  Defendant concedes that Plaintiff has established the first and third elements of her prima facie case.  (Oral Arg. 36:15–21.)  Plaintiff has established that she is member of a protected class based on her gender, satisfying the first element.  *See Alexander v. City of New York*, No. 11-CV-4638, 2013 WL 3943496, at *6 (E.D.N.Y. July 23, 2013) ("There is no dispute that plaintiff, as a female, is a member of a protected class.").  In addition, Plaintiff was not promoted to the Director of Stores position, satisfying the third element.  *See Sandor*, 2011 WL 115295, at *9 (finding third element established where plaintiff was not selected for the position).  Defendant argues that Plaintiff did not apply for the position and, in any event, was not qualified for the position.  Defendant further argues that Plaintiff cannot show that the failure to promote her occurred under circumstances giving rise to an inference of discrimination.

### 1.  Plaintiff's Application and Qualification for the Position

#### A.  Plaintiff's Application

In order to establish the second element of her prima facie case, a plaintiff must demonstrate that she applied and was qualified for a position for which the employer was seeking applicants.  *See Yu*, 494 F. App'x at 125 (listing second element as requiring the plaintiff to establish that he "applied and was qualified for a job for which the employer was seeking applicants" (citation omitted)).  Although a plaintiff generally must file a formal application in order to demonstrate that she applied for the higher position, a plaintiff's informal notification to her supervisors of her interest in the position is sufficient where the "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled

or (b) attempted to apply for it through informal procedures endorsed by the employer."
*Petrosino v. Bell Atl.*, 385 F.3d 210, 227 (2d Cir. 2004) (finding that, although the plaintiff may
have been excused from filing a timely *formal* application for the official manager vacancies, she
was not excused from "informally applying for the positions by telling her supervisors that she
wished to be considered for these three official manager openings"); *see also Harding v.
Wachovia Capital Markets, LLC*, No. 10-CV-3496, 2012 WL 4471543, at *7–8 (S.D.N.Y.
Sept. 21, 2012) (holding that plaintiff presented sufficient evidence to establish that he applied
for the position where he expressed interest in the position and the parties disputed whether the
position was formally posted); *Jones v. W. Suffolk Boces*, No. 03-CV-3252, 2008 WL 495498, at
*10 (E.D.N.Y. Feb. 20, 2008) ("[A]pplying for or expressing interest in a specific position is a
condition precedent to establishing a prima facie case for a failure to hire/promote claim."), *aff'd*,
330 F. App'x 329 (2d Cir. 2009); *Goss v. Bernier*, No. 05-CV-9592, 2007 WL 423966 (S.D.N.Y.
Feb. 7, 2007) (finding that the informal application process followed by the plaintiff was
sufficient because it was condoned by the defendant).  Defendant does not argue that the
informal procedure followed by Plaintiff would not have been sufficient to establish that she
applied for the position.  Instead, Defendant argues that Plaintiff did not timely apply for the
position because she did not express any interest in the Director of Stores position until March or
April 2009, at least two to three months after Copeland had already been hired.  (Def. Mem. 27
n.4.)  However, according to Plaintiff's deposition testimony, she first approached I.G. about the
Director of Stores position two days after Jasner was terminated and before Gittler was selected
for the position.  (Pl. Dep. 171:7–172:24.)  She also expressed her interest in the position to
Raymond.  (Pl. Dep. 171:19–173:6.)  Thus, there is a genuine dispute of material fact as to
whether Plaintiff applied for the Director of Stores position.

34

## B.   Plaintiff's Qualifications

Defendant argues that Plaintiff was not qualified to be Director of Stores.  The Second

Circuit has held that in order to establish that she was qualified for the position, a plaintiff must

establish "basic eligibility for the position at issue." *Aulicino v. New York City Dep't of*

*Homeless Servs.*, 580 F.3d 73, 81 (2d Cir. 2009) (quoting *Slattery v. Swiss Reinsurance Am.*

*Corp.*, 248 F.3d 87, 91–92 (2d Cir. 2001), *cert. denied*, 534 U.S. 951 (2001)).  Eligibility

requirements are defined by the employer, and a plaintiff's subjective belief that she is qualified

for the position is not sufficient.  *See Aulicino*, 580 F.3d at 81 (analyzing whether the plaintiff

was qualified for the position based on the qualifications listed in the employer's job posting);

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 127 (2d Cir. 2004) (explaining that "being

'qualified' refers to the criteria the employer has specified for the position'"); *Workneh v. Pall*

*Corp.*, 897 F. Supp. 2d 121, 131 (E.D.N.Y. 2012) (dismissing plaintiff's failure to promote claim

because he failed to establish that he was qualified for either position he sought, and, "in

determining whether a plaintiff has met his *prima facie* burden of demonstrating he was qualified

for a position, being qualified refers to the criteria the employer has specified for the positions,

and a plaintiff's subjective belief he is qualified will not suffice" (internal quotation marks

omitted) (quoting *Williams*, 378 F.3d at 127)); *Antunes v. Putnam/N. Westchester Bd. of Co-op.*

*Educ. Servs.*, No. 09-CV-3063, 2011 WL 1990872, at *5 (S.D.N.Y. May 19, 2011) ("In

determining whether an employee who applied for and was denied a promotion to a particular

position was 'qualified' for that position, the Second Circuit has held that 'being qualified' refers

to the criteria the employer has specified for the position.'  Accordingly, 'in order to establish a

prima facie case of discrimination, [Plaintiff] must show that []he met the defendant's criteria for

the position.'" (alterations in original) (citations omitted)), *aff'd sub nom.*, 482 F. App'x 661 (2d

Cir. 2012); *Herschman v. City Univ. of New York*, No. 08-CV-11126, 2011 WL 1210200, at *10

(S.D.N.Y. Feb. 28, 2011) ("Turning to the second element of a *prima facie* case, '[w]hether an individual is 'qualified' for a job must be assessed in relation to the criteria the employer has specified for the position, not criteria that seem reasonable to the litigant, or to this Court.'" (quoting *Sarmiento v. Queens College CUNY,* 386 F. Supp. 2d 93, 97 (E.D.N.Y. 2005))), *report and recommendation adopted*, No. 08-CV-11126, 2011 WL 1210209 (S.D.N.Y. Mar. 29, 2011). To satisfy this element, a plaintiff must demonstrate that she possessed "the basic skills necessary for performance of the job." *Herschman*, 2011 WL 1210200, at *10.

At the time Plaintiff sought the promotion to the Director of Stores position, Defendant did not have an official job description for the position.  (Pl. 56.1 ¶¶ 58–59.)  The parties agree that the duties of the Director of Stores included "responsibility for and oversight of all of the individual Century 21 stores, including the General Store Managers who run each of the stores, providing a strategic vision and plan for the overall growth and expansion of the business, and supervising the top Human Resources person at Century 21."  (Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55.) According to Raymond, the Director of Stores was required to have "experience managing large and high-volume retail stores, preferably with multiple locations, preparing and meeting budgets, the ability to design and implement large scale improvements and proven leadership and motivation skills," and to "have the ability to develop and implement a plan for the growth of the Company and the strengthening of the Century 21 brand.  (Def. 56.1 ¶ 59.)  Defendant admits, however, that it did not require that the Director of Stores have all of these qualifications at the time it hired Gittler.  Raymond based his decision to hire Gittler upon the imminence of the fourth quarter and Gittler's having been both available and not "someone off the street," but instead someone who "knows the people" and has "been here."  (R. Gindi Dep. 99:11–21.)

At the time of Gittler's selection, Plaintiff was available and was more familiar with the Century 21 staff than Gittler, as she had worked for Century 21 for almost twice as long as Gittler, and, while Gittler had not worked for Century 21 in four years, Plaintiff had worked for Century 21 for 11 years continuously.  Although Plaintiff had not managed a Century 21 store or any other high-volume store, Plaintiff has presented evidence that she met some of Defendant's other requirements for the Director of Stores position.  As Senior Merchandising Coordinator, Plaintiff had "responsibility for training and developing store managers," and she exercised "dotted-line supervisory authority" over the General Store Managers."  (Pl. 56.1 ¶¶ 255, 261.) She was involved in hiring employees and supervised the clerical staff and Coordinators.  (Pl. 56.1 ¶¶ 49, 290, 292, 420; Pl. Decl. ¶ 7.)[16]  Plaintiff visited the various stores, assessed merchandizing issues and worked to communicate and effectuate I.G.'s vision across numerous stores and constituencies.  (Pl. 56.1 ¶ 231.)[17]  Although Defendant maintains that Plaintiff did not yet have experience supervising more than a few clerical employees, training and developing

---

[16]  Plaintiff also argues that she was placed in charge of a multi-million dollar budget. (Pl. Opp'n 38 n.42.)  However, Plaintiff did not assume this role until April 2009, six months after Gittler was hired and three months after Copeland was hired.  (Pl. Dep. 98–99.)  Plaintiff did not have responsibility for a multi-million dollar budget in 2008 when she sought the promotion to the Director of Stores position.

[17]  Defendant argues that Plaintiff's deposition testimony regarding the new responsibilities she assumed as Senior Manager of Operations, to which she was promoted on June 1, 2010, further emphasizes her lack of qualifications, because she necessarily did not have those responsibilities or experiences when Gittler was hired as interim Director of Stores.  (Def. Reply 8–9.)  Plaintiff testified that in her new position, she, among other things, held one-on-one meetings with store managers, attended general store manager meetings and capital meetings, exercised more responsibility over each store, and proposed ideas to streamline operations.  (Pl. Dep. 143–45, 350–54, 433–34, 499, 612–14, and 559–63.)  Although Plaintiff may not have exercised these specific job responsibilities in 2008, Plaintiff has presented evidence that she did exercise some authority over the general managers at the time she allegedly applied for the Director of Stores position.

store managers or hiring employees, these are disputed issues of fact that must be determined by a jury.

In addition, Plaintiff has presented evidence that she actually performed the job of Director of Stores temporarily, or at least assumed many of the responsibilities, with the consent of Raymond and I.G.  Plaintiff testified that she took on the responsibilities of Director of Stores, with the support of Raymond and I.G., until another Director of Stores could be hired, and that the Gindis agreed, expressing confidence in her abilities and thanking her.  (Pl. Dep. 184:3–185:14.)  Coordinator Sewere testified that during her tenure when the Director of Stores position was unoccupied, Plaintiff assumed some of its responsibilities; that, on these occasions, she was at meetings in which I.G. specifically instructed the Coordinators, GSMs and other attendees that Plaintiff would step in while the search for a new Director of Stores proceeded; and that she was also advised of Plaintiff's responsibilities by I.G.  (Sewere Dep. 95:18–96:11, 110:6–14:12.)  Coordinator Bigord testified that when there were vacancies for the Director of Stores position, she was similarly instructed by her direct supervisor, DMM Aqualino, who stated that Plaintiff was conveying the direct orders of I.G.  (Bigord Dep. 84:11–85:23, 93:17–95:22.)[18]  *See Zakre v. Norddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 507 (S.D.N.Y. 2005) (holding that plaintiff had demonstrated that she met the basic qualifications for treasurer, the promotion she sought, because her experience and qualifications were

---

[18]   In addition to her own testimony and that of Coordinators Sewere and Bigord, Plaintiff has submitted an email she sent to Raymond and I.G. in which she states that it is her "turn to support [them]/Century to get through this time," and that "[w]e will as a team do our best to step up and not let anything fall through the cracks.  (Pl. Ex. 31.)  She tells them both to "[p]lease count on [her] for whatever [they] need."  (*Id.*)  Raymond thanked her, stating "[w]e really appreciate it."  (*Id.*)  A jury could conclude, as Plaintiff argues, that the emails refer to the arrangement Plaintiff testified to, namely that she would "support [them]" by assuming some of the responsibilities of the Director of Stores.

acknowledged by her colleagues and she had previously held the position of treasurer and served as acting treasurer while the defendant sought a replacement); *Vargas v. Chubb Grp. of Ins. Companies*, No. 99-CV-4916, 2002 WL 31175233, at *4 (S.D.N.Y. Sept. 30, 2002) (finding that the plaintiff had established that she was qualified for the promotion because she "had many of the requisite qualifications and much of the requisite experience," and she was already performing many of the duties of the position); *Brennan v. City of White Plains*, 67 F. Supp. 2d 363, 372–73 (S.D.N.Y. 1999) (holding that the fact that plaintiff, following Deputy Commissioner's departure, "reportedly assumed many of his job duties until a successor was chosen" renders plaintiff's "qualifications for the Deputy Commissioner position . . . a live issue").

Defendant has presented contrary evidence indicating that Plaintiff never acted as interim or acting Director of Stores and that, in fact, it was Stacy Brasner, the General Store Manager of the Cortlandt Street Century 21 store, who filled in as the Director of Stores on a temporary basis.  (Def. Mem. 28 n.3; R. Gindi Dep. 48:12–51:9, 58:25–61:10.)  It is not for this Court to decide whether to credit Plaintiff's version or Defendant's version of the facts.  *See In re Fosamax Products Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) ("[T]he general rule remains that 'a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury.'" (quoting *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)), *cert. denied*, 569 U.S. ---, 133 S. Ct. 2783 (2013); *Milfort v. Prevete*, No. 10-CV-4467, 2013 WL 519041, at *5 (E.D.N.Y. Feb. 13, 2013) ("[T]he credibility of witnesses is not to be assessed by the court on a motion for summary judgment.  Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on

summary judgment." (citations and internal quotation marks omitted)).  Defendant argues that, even if Plaintiff served as acting Director of Stores, she did so only for a short period of time, (Def. Mem. 28), but the significance of Plaintiff's alleged temporary assumption of responsibilities is a question best left for the jury, as it goes to the weight of Plaintiff's evidence. *See McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) ("It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" (alteration in original) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997))).  Though Plaintiff has not established that she satisfied all of Defendant's purported requirements for the Director of Stores position, neither did Gittler, the individual chosen to fill the position instead of Plaintiff.

Plaintiff's burden at this stage is minimal.  Plaintiff has provided evidence that she assumed at least some of the Director of Stores responsibilities while the position was vacant and has thus provided sufficient evidence from which a reasonable jury could conclude that she applied for and had the minimal qualifications for the Director of Stores position.  *See Antunes*, 2011 WL 1990872, at *5–6 (finding that although plaintiff did not demonstrate that he had experience in "each area of knowledge, skill, and ability enumerated in [the defendant's] job description," evidence demonstrating his experience in the key areas was sufficient to establish that he was qualified for the position "[g]iven that . . . the burden at the [prima facie] stage is *de minimis*").

### 2.   Inference of Discrimination

In order to establish the fourth element of her prima facie case, Plaintiff must establish that she was denied the promotion under circumstances giving rise to an inference of discrimination.  *See Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012); *Arroyo v. New York Downtown Hosp.*, No. 07-CV-4275, 2010 WL 3861071 (E.D.N.Y. Sept. 28, 2010).

Inference of discrimination "is a 'flexible [standard] that can be satisfied differently in differing factual scenarios.'" *Howard v. MTA Metro-N. Commuter R.R.*, 866 F. Supp. 2d 196, 204 (S.D.N.Y. 2011) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996)). "No one particular type of proof is required to show that [the adverse employment action] occurred under circumstances giving rise to an inference of discrimination." *Ofoedu v. St. Francis Hosp. & Med. Ctr.*, No. 04-CV-1707, 2006 WL 2642415, at *14 (D. Conn. Sept. 13, 2006). This element may be established by evidence that the position was filled by an individual who was not a member of the plaintiff's protected class or that the position remained open and the defendant "continued to seek a candidate with plaintiff's qualifications." *Sandor*, 2011 WL 115295, at *8–9; *see also Lovell v. Maimonides Med. Ctr.*, No. 11-CV-4119, 2013 WL 4775611, at *12 n.23 (E.D.N.Y. Sept. 6, 2013) ("[I]t is possible to draw an inference of discrimination regarding a failure to promote claim where a plaintiff is rejected for a position which is later filled by an individual outside of the plaintiff's protected class . . . ."); *Dabney v. Christmas Tree Shops*, No. 10-CV-8734, 2013 WL 3820668, at *10 (S.D.N.Y. July 24, 2013) (finding that the plaintiff established an inference of discrimination where the position she applied for, but did not receive, was eventually filled by an individual outside her protected class (citing *Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001))); *Shortt v. Congregation KTI*, No. 10-CV-2237, 2013 WL 142010, at *9 (S.D.N.Y. Jan. 9, 2013) ("For claims brought under Title VII, in order to raise an inference of discrimination at the *prima facie* stage, it is typically sufficient for a plaintiff to show that the position was filled by someone outside of his protected class."). Plaintiff has provided evidence that, after she initially expressed interest in the Director of Stores position, Defendant offered the position to Gittler, an individual outside of her protected class. Plaintiff has presented sufficient evidence to establish there are genuine issues

of material fact as to the existence of a prima facie case of gender discrimination based upon Defendant's failure to promote her to the temporary Director of Stores position.

## ii.   Non-Discriminatory Explanation

Defendant claims that Plaintiff lacked the necessary experience for the Director of Stores position and that Gittler had superior qualifications because he had previously served as a GSM with Defendant.  Thus, Defendant has offered legitimate, non-discriminatory reasons for its decision not to promote Plaintiff.  *See Antunes*, 2011 WL 1990872, at *7 (finding that defendant satisfied its burden to provide a legitimate, nondiscriminatory reason for failing to promote plaintiff by demonstrating that the person selected was better qualified for the position); *Sandor*, 2011 WL 115295, at *9 (holding that defendant's contention that plaintiff lacked the necessary interpersonal skills and attention to detail required for the senior director position was a legitimate, non-discriminatory reason for its decision not to promote plaintiff).

## iii.   Pretext

To avoid summary judgment, a "plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)); *see also Nassar*, 570 U.S. at ---, 133 S.Ct. at 2526; *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013).[19]  A plaintiff "can demonstrate pretext with direct evidence . . .

---

[19]   Defendant argues that Plaintiff cannot survive summary judgment because she cannot demonstrate that her qualifications were "so superior" to the credentials of Gittler.  (Def. Mem. 29; Def. 56.1 ¶ 83.)  "A plaintiff may defeat summary judgment when his employer rebuts the prima facie case by coming forward with sufficient evidence from which a reasonable juror could conclude that his credentials are so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Dent v. U.S. Tennis Ass'n*, No. 08-

or with indirect or circumstantial evidence." *Bagley v. J.P. Morgan Chase & Co.*, No. 10-CV-1592, 2012 WL 2866266, at *12 (S.D.N.Y. July 12, 2012).  For example, "[a] plaintiff may show pretext by illuminating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons that would raise doubt in the factfinder's mind that the employer did not act for those reasons." *Bagley*, 2012 WL 2866266, at *12 (internal quotation marks omitted) (quoting *Clarke v. Pacifica Foundation,* No. 07-CV-4605, 2011 WL 4356085, at *9 (E.D.N.Y. Sept. 16, 2011)); *see also Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.").  A plaintiff may also submit "evidence of remarks made by the employer at or about the time of the adverse action 'to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark.'  'The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the alleged discriminatory behavior, the more probative that remark will be.'"  *Herbert v. City of New York*, 748 F. Supp. 2d 225, 239 (S.D.N.Y. 2010) (quoting *Tomassi*, 478 F.3d at 115); *see also Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 575–76 (S.D.N.Y.

---

CV-1533, 2011 WL 308417 (E.D.N.Y. Jan. 27, 2011) (citations and internal quotation marks omitted).  However, Plaintiff does not seek to prevent summary judgment on the strength of the discrepancy in qualifications alone.  *See Sandor v. Safe Horizon, Inc.*, No. 08-CV-4636, 2011 WL 115295, at *9–10 (E.D.N.Y. Jan. 13, 2011) (finding that where plaintiff offered additional circumstantial evidence, plaintiff did not need to demonstrate that "no reasonable person" would have selected her competitor); *Collins v. Cohen Pontani Lieberman & Pavane*, 2008 WL 2971668, at *12 n.37 (S.D.N.Y. July 31, 2008) (explaining that it is only when "'a plaintiff seeks to prevent summary judgment [solely] on the strength of a discrepancy in qualifications'" that she is required to show that "her qualifications were so superior to the person[] selected that no reasonable person could have chosen the candidates selected over her but for gender bias" (alteration in original) (citations omitted)).  Plaintiff does not rely on the discrepancy in qualifications between her and Gittler.  Instead, she has presented additional evidence that Defendant's failure to promote her was discriminatory, and therefore the "so superior" standard is inapplicable.

2012) ("Discriminatory or stereotypical remarks are admissible in gender discrimination cases because they may tend to show discriminatory animus."); *Hall v. Family Care Home Visiting Nurse & Home Care Agency, LLC*, 696 F. Supp. 2d 190, 199 (D. Conn. 2010)  ("[E]ven if one stray remark is by itself insufficient proof, it may bear a more ominous significance when considered within the totality of all the evidence." (internal quotation  marks omitted) (quoting *Carlton v. Mystic Transp., Inc*., 202 F.3d 129, 136 (2d Cir. 2000))), *on reconsideration in part*, No. 07-CV-0911, 2010 WL 1487871 (D. Conn. Apr. 12, 2010); *Smith v. K & F Indus.*, 190 F. Supp. 2d 643, 651 (S.D.N.Y. 2002) ("Where offensive remarks are combined with other evidence of discriminatory intent, courts are reluctant to grant summary judgment for the defendant." (citation and internal quotation marks omitted)).[20]

Plaintiff has presented circumstantial evidence challenging Defendant's proffered non-discriminatory explanation for failing to consider her for the promotion and a discriminatory remark made by I.G.  Based on this evidence, a reasonable jury could find that Defendant's proffered reason for not promoting Plaintiff to the temporary Director of Stores position in October 2008 was pretextual.

### 1.    Challenge to Defendant's Proffered Explanation

Factual issues relating to Plaintiff's role and responsibilities at the time she sought the promotion to the temporary Director of Sales position raise questions about Defendant's decision

---

[20]   At the pretext stage, a court may "re-consider evidence presented to find an inference of discrimination at the prima facie stage."  *Ingenito v. Riri USA, Inc.,* No. 11-CV-2569, 2013 WL 752201, at *12 (E.D.N.Y. Feb. 27, 2013); *see also O'Diah v. Yogo Oasis*, No. 11-CV-309, 2013 WL 3796619, at *8 (S.D.N.Y. July 22, 2013) ("In the course of attempting to [establish pretext], a plaintiff may rely on the evidence supporting his *prima facie* case or any additional evidence of discrimination."); *Robinson v. Zurich N. Am. Ins. Co.*, 892 F. Supp. 2d 409, 428 (E.D.N.Y. 2012) ("To meet this [pretext] burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence.  Such additional evidence may include direct or circumstantial evidence of discrimination.").

not to consider Plaintiff for the position.  Plaintiff, Coordinator Sewere and Coordinator Bigord testified that Plaintiff filled in, or assumed some of the responsibilities of, the Director of Stores position while it was vacant.  (*See* Part II.b.i.1.)  Despite Plaintiff's assumption of these responsibilities, and the fact that she was I.G.'s "right hand," she was not considered for the temporary Director of Stores position, even though she expressed an interest in the position after Jasner departed, both to I.G. and Raymond.  (I. Gindi 170:19–24; R. Gindi 100:10–14; Pl. Dep. 171–72.)  In addition, Defendant's admitted reasons for hiring Gittler instead of Plaintiff — that he was not "someone off the street," but someone who "knows the people" and had worked for Defendant — also applied to Plaintiff.  Plaintiff had worked for Defendant twice as long as Gittler.  Moreover, Gittler's prior employment with Defendant was terminated for poor work performance and, according to Plaintiff, sexual harassment complaints had been filed against him.  (Pl. Dep. 209:23–210:11.)

## 2.    Gender-Based Statement Made By I.G.

Plaintiff has also presented a statement made by I.G. as evidence of Defendant's discriminatory animus in not promoting her to the temporary Director of Stores position in October 2008.  After Plaintiff was not considered for the temporary Director of Stores position, she discussed the position with I.G. after Gittler departed, and I.G. told her that in order to earn the position she just needed to "keep doing what [she] was doing."  (Pl. Dep. 177:2–179:11, 346:2–12.)  After Copeland was hired, Plaintiff again approached I.G. about the position.  (*Id.* at 166:8–167:21.)  She noted that the Director of Stores position had opened several times and that she had not been afforded "the opportunity to go forward with that," and asked what she needed to do to obtain the position.  (*Id.* at 167:7–21; *see also id.* at 175:17–180:2.)  I.G. replied, "Lori, you are young, you have young children. It's a lot of hours. You don't want the position. You are the mom." (*Id.* at 167:23–168:2.)  Although I.G. denies making this statement, (I.G. Decl. ¶¶ 10–

45

11), the parties' dispute creates an issue of fact that must be decided by the jury.  *See In re Fosamax*, 707 F.3d at 194; *Milfort*, 2013 WL 519041, at *5.

When assessing whether a particular remark provides evidence of discriminatory animus, courts have generally found that "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi*, 478 F.3d at 115 (explaining that the "relevance of discrimination-related remarks" depends on "their tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class").  "In determining whether a remark is probative, [district courts] have considered four factors: (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)."  *Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see also Obinabo v. Radioshack Corp.*, --- F. App'x ---, ---, 2013 WL 2450544, at *1 (2d Cir. June 7, 2013) ("When considering 'stray remarks' as evidence of discrimination, courts consider who made the remark, when the remark was made in relation to the employment decision, the remark's content, and the context in which the remark was made." (citing *Henry*, 616 F.3d at 149)); *Tomassi*, 478 F.3d at 115 ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."); *Moccio*, 889 F. Supp. 2d at 576 (analyzing whether particular remarks were probative of discrimination based on the four factors listed in *Henry*), *aff'd*, --- F. App'x. ---, 2013 WL 1943276 (2d Cir. May 13, 2013).  The Second Circuit has cautioned that none of these four factors should be regarded as

dispositive. *Henry*, 616 F.3d at 149.  For the reasons discussed below, Plaintiff has demonstrated

that there are genuine issues of material fact regarding whether I.G.'s comment constitutes

evidence of gender discrimination.

## A.   Source of the Remark

The remark was made by I.G., who, as co-CEO, wielded substantial influence over

Defendant's employees, including Plaintiff.[21]  *See Greenbaum v. Handelsbanken*, 67 F. Supp. 2d

---

[21]   Defendant argues that I.G.'s positive working relationship with Plaintiff undermines her argument.  (Def. Mem. 35 n.10.)  The cases cited by Defendant in support of this argument address situations in which the person who hired or promoted the plaintiff was also the one who fired the plaintiff or denied the plaintiff benefits.  *See Carlton v. Mystic Trans., Inc.*, 202 F.3d 129, 138 (2d Cir. 2000) (finding that the "same actor inference" applied because plaintiff was hired and fired by the same individual); *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000) (granting summary judgment where plaintiff was fired by the same person who had hired him three years earlier and failed to offer additional evidence); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (stating that where the same person made the decision to hire and fire a plaintiff, it is "difficult to impute to her an invidious motivation"); *Figueroa v. N.Y.C. Health and Hosps. Corp.*, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007) (finding the same-actor inference applicable where "plaintiff allege[d] discrimination" in the denial of sick leave by "the same woman who approved her promotion"); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07-CV-11316, 2009 WL 900739 (S.D.N.Y. Apr. 3, 2009) (finding that "any discriminatory inference" regarding plaintiff's termination was "belied by the history of the working relationship between [p]laintiff and her alleged discriminator"), *aff'd*, 372 F. App'x 137 (2d Cir. 2010); *Austin v. Ford Models, Inc.*, No. 95-CV-3731, 2000 WL 1752966, at *14 (S.D.N.Y. Nov. 29, 2000) (granting defendant summary judgment where, among other things, plaintiff was fired by the same person who hired her).  The same actor inference is "permissive, not mandatory," and the Court is not persuaded that it should apply here.  *See Johnson v. Connecticut*, 798 F. Supp. 2d 379, 390 (D. Conn. 2011) (finding that the "same actor" inference did not apply in a failure to promote case because "a jury could find that a supervisor would be willing to hire a member of the protected class for the [plaintiff's initial] position, but refuse to promote him to a position that includes a higher salary, job security and benefits"); *see also Harris v. City of New York*, No. 03-CV-6167, 2004 WL 2943101 (S.D.N.Y. Dec. 21, 2004) (noting the difference and that "an employer may be willing to hire a member of a protected class, but unwilling to promote that person because of her protected status").  Although I.G. had promoted Plaintiff numerous times and supported her promotion to Senior Manager of Operations, Plaintiff alleges that when she asked him what she needed to do obtain the Director of Stores position, after having expressed interest in the position twice and having the position filled by a male both times, I.G. told her that she did not want the position because she was a mother with young children.  (Pl. Dep. 166–68, 179–80, 217, 338.)  A reasonable jury could find that I.G. was supportive of Plaintiff, even though she was a woman, but not willing to promote her to the Director of Stores position, because she was a woman.

228, 253–54 (S.D.N.Y. 1999) ("[C]omments by high-ranking officials . . . are admissible as . . .
evidence suggesting that there is a particular [discriminatory] corporate atmosphere in which
decisions are made.").  For most of her tenure at Century 21, Plaintiff worked under or reported
directly to I.G.  I.G. recommended Plaintiff for several promotions, and Copeland sought his
"blessing" in order to promote Plaintiff to Senior Manager of Operations.  (Pl. 56.1 ¶¶ 574–76.)
*See Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (holding that
discriminatory remarks by "individuals with substantial influence over [the plaintiff's]
employment" are relevant in determining whether an employment decision was motivated by
discriminatory animus); *Eldaghar v. City of N.Y. Dept. of Citywide Admin. Servs.*, No. 02-CV-
9151, 2008 WL 2971467, at *9 (S.D.N.Y. July 31, 2008) (holding that a jury could reasonably
find pretext and discriminatory motivation based on oral comments by plaintiff's supervisors
who had a substantial influence over plaintiff's employment).

In addition, although I.G. was not the ultimate decision maker regarding the selection of
the Director of Stores, Plaintiff has presented evidence that I.G. played a role in the selection
process.  Plaintiff testified that when she initially approached I.G. about the Director of Stores
position, I.G. informed her that he had to speak with his brother Raymond.  (Pl. Dep. 171:19–
72:4.)  When she approached Raymond about the position, he too said he would need to speak
with his brother I.G.  (*Id.*)  I.G. testified at his deposition that he had "input" into the hiring
decision of the Director of Stores.  (IG Dep. 38:18–39:11.)  *See Back v. Hastings on Hudson
Union Free Sch. Dist.*, 365 F.3d 107, 125 (2d Cir. 2004) ("The Second Circuit has held that bias
of a single individual at any stage of the promoting process may taint the ultimate employment
decision."); *Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894, 2012 WL
3288234, at *7 (E.D.N.Y. Aug. 10, 2012) (finding that this factor weighted in favor of plaintiff

48

where there was at least a factual dispute as to the speaker's role in the decision to fire the plaintiff, and, "[e]ven if [the speaker] was not involved, she was [the plaintiff's] direct supervisor as well as the daughter of [an] owner, she was not a colleague or low-level employee"). Although Defendant maintains that I.G. did not play a meaningful role in selecting the Director of Stores and that, in the case of Gittler, Raymond made the decision on his own, this is a factual determination that must be made by the jury.  (Def. Mem. 34; Def. Reply 19; R. Gindi Decl. ¶¶ 15, 17–20; R. Gindi Dep. 100; I.G. Dep. 168.)

## B.   Timing of the Remark

I.G.'s remark was made in March 2009, approximately five months after Gittler was hired as the temporary Director of Stores.[22]  (Pl. Dep. 167:7–168:12.)  Although there is no bright line rule regarding what length of time renders an allegedly discriminatory remark too attenuated to constitute evidence of discrimination, courts in this Circuit have generally found that a five month lapse between an allegedly discriminatory statement and an adverse employment action is too long a gap to find the remark probative of discrimination without some other evidence that the remark was related to the adverse employment action.  *See, e.g.*, *Yoselovsky v. Associated Press*, 917 F. Supp. 2d 262, 278 (S.D.N.Y. 2013) (listing cases in which comments made four to five months prior to the plaintiff's termination did not constitute evidence of discrimination); *Callistro v. Cabo*, No. 11-CV-2897, 2013 WL 322497, at *7–8

---

[22]  Defendant argues that the remark is insufficient to create an inference of discrimination because, at the time it was allegedly made, Copeland had already been selected as the new permanent Director of Stores.  (Def. Mem. 34–35; Def. Reply 18–19.)  The timing of the remark is only one factor a court considers when assessing whether a particular remark is evidence of discrimination.  A comment made after the position in question had already been filled may still support an inference that the promotion decision was based on an unlawful motive.  *See Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) (finding that comments attributing plaintiff's failure to receive the job at issue to his "being too old to promote," although made several years after that position was filled, could support an inference that age was a factor in promotion decisions).

(S.D.N.Y. Jan. 25, 2013) (finding that a four month gap was too long for discriminatory remarks to indicate that the defendants terminated plaintiff with discriminatory intent, where there was no evidence that discriminatory remarks were made in relation to the termination decision); *Buckman v. Calyon Sec. (USA), Inc.*, 817 F. Supp. 2d 322, 335–36 (S.D.N.Y.2011) (holding that an inappropriate comment that was unconnected to the plaintiff's discharge and made five months prior to termination was "too remote in time and context" to support plaintiff's discrimination claim); *Del Franco v. N.Y.C. Off-Track Betting Corp.*, 429 F .Supp. 2d 529, 537 (E.D.N.Y. 2006) (finding no temporal connection where "slightly more than three months" elapsed between the alleged discriminatory remarks and the plaintiff's termination), *aff'd*, 245 F. App'x 42 (2d Cir. 2007).  Since five months lapsed between Gittler's hire and I.G.'s comment, Plaintiff cannot rely on the comment's temporal proximity to render it probative of discrimination.

## C.   Content of the Remark

I.G.'s alleged statement that Plaintiff would not want the Director of Stores position because she was a mother with young children evidences discriminatory animus based on Plaintiff's gender.  Stereotyping of women as caregivers may, without more, be sufficient evidence of an impermissible, sex-based motive for an adverse employment decision to survive summary judgment.  *See Back*, 365 F.3d at 121 (holding that stereotyped remarks that a woman cannot "be a good mother" and have a job that requires long hours and that a mother would not show the same level of commitment because she had little ones at home were sufficient, as a matter of law, to provide evidence of discriminatory intent); *see also Sassaman v. Gamache*, 566 F.3d 307, 313 (2d Cir. 2009) ("When employment decisions are based on invidious sex stereotypes, a reasonable person could infer the existence of discriminatory intent.").

### D.   Context in Which the Remark was Made

The alleged remark was made in response to Plaintiff's inquiry about the Director of Stores position, and therefore it is directly related to Defendant's decision not to promote Plaintiff.  A reasonable jury could conclude that in making the alleged comment, I.G. was explaining to Plaintiff why she had not previously been selected for the position.  *See Tomassi*, 478 F.3d at 116 (holding that the discrimination-related remarks "could reasonably be construed" as explaining why the decision to terminate the plaintiff was taken, and, considering all the circumstances, a jury could find the remarks as "persuasive evidence" that the plaintiff's termination was motivated by discrimination); *Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) (finding that comments attributing plaintiff's failure to receive the job at issue to his "being too old to promote," although made several years after that position was filled, could support an inference that age was a factor in promotion decisions); *Klings v. N.Y. State Office of Court Admin.*, No. 04-CV-3400, 2010 WL 1292256, at *15 (E.D.N.Y. Apr. 5, 2010) ("[S]upervisors' remarks may be probative of a discriminatory motive when they describe why a decision was made."  (citing *Tomassi*, 478 F.3d at 115)); *Dupree*, 2012 WL 3288234, at *6–7 (holding that statements such as defendants "had a practice of not hiring black people" were "directly related to the claimed discriminatory motive in terminating [plaintiff] and 'could reasonably be construed . . . as explaining why that decision was taken." (quoting *Tomassi*, 478 F.3d at 116)).

Drawing all inferences in favor of Plaintiff, I.G.'s comment suggests that I.G. believed that, because Plaintiff was a mother with young children, she was not well suited to fill the temporary Director of Stores position and was not promoted for that reason.  Instead, Gittler, a male who had previously been terminated by Defendant for poor performance and had been the

subject of sexual harassment complaints, was selected for the position.  This evidence raises a triable question of fact as to whether I.G.'s remark constitutes evidence of discrimination.[23]

Reviewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has presented disputed issues of fact from which a reasonable jury could conclude that Defendant's failure to promote Plaintiff to the Director of Stores position was motivated in part by discriminatory animus on the basis of her gender.[24]  Defendant's motion for summary judgment as to Plaintiff's gender discrimination claims is denied.

### c.   Retaliation Claims

Plaintiff claims that she was terminated in retaliation for filing a complaint of sexual harassment against Copeland on behalf of a colleague.  (Pl. Opp'n 51.)  Claims of retaliation for

---

[23] Defendant argues that, even if the remark does indicate discriminatory intent, Plaintiff cannot prevail because she was not qualified for the Director of Stores position.  Defendant relies on *Edwards-Thompson v. Viacom Int'l, Inc.*, No. 91-CV-6365, 1997 WL 431036, at *2–5 (S.D.N.Y. July 31, 1997), in which the court held that plaintiff failed to establish a prima facie claim of discrimination based on the defendant's failure to promote her to a particular position, because the plaintiff did not have the required qualifications for the position, even though the plaintiff's supervisor told her she was not hired because there were "too many minorities in key positions."  In *Edwards-Thompson*, the position required three qualifications, none of which the plaintiff possessed and all of which the person selected did possess.  In this case, however, the parties dispute what qualifications were required for the Director of Stores position and neither Plaintiff nor Gittler possessed all of the qualifications that Defendant purportedly required.  Moreover, both possessed the qualifications that Raymond testified drove his selection of Gittler — availability, prior work with Century 21 and familiarity with the staff.

[24] Defendant argues that Plaintiff's claim that her gender was the reason she was not promoted is undermined by the fact that Raymond offered the Director of Stores position to a female candidate in May 2011, (Def. Mem. 32 n.9), and the fact that there are a large number of women in management positions at Century 21, (*id.* at 33.)  Although the jury may consider such comparative evidence, "what matters is how [Plaintiff] was treated."  *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).  As previously discussed, Plaintiff has provided direct evidence from which a jury could conclude that she was not promoted to the temporary Director of Stores position based on an impermissible gender stereotype.  "[S]tereotyping of women as caregivers can by itself and without more be evidence of an impermissible, sex-based motive."  *Id.*

engaging in protected conduct under Title VII are examined under the *McDonnell Douglas*

burden shifting test.[25]  *McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Summa*, 708 F.3d at

125 ("The burden-shifting framework laid out in *McDonnell Douglas* . . . governs retaliation

claims under . . . Title VII").  Under the test, "[f]irst, the plaintiff must establish a *prima facie*

case of retaliation.  If the plaintiff succeeds, then a presumption of retaliation arises and the

employer must articulate a legitimate, non-retaliatory reason for the action that the plaintiff

---

[25]  Traditionally, "[t]he standards for evaluating . . . retaliation claims are identical under Title VII and the NYSHRL."  *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n. 1 (2d Cir. 2000)); *Vandewater v. Canandaigua Nat. Bank*, 893 N.Y.S.2d 916 (2010) ("It is well settled that the federal standards under [T]itle VII of the Civil Rights Act of 1964 are applied to determine whether recovery is warranted under the Human Rights Law." (citing *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 330 (2004))); *Forrest*, 3 N.Y.3d at 330 (stating that "[b]ecause both the Human Rights Law and [T]itle VII address the same type of discrimination, afford victims similar forms of redress, are textually similar and ultimately employ the same standards of recovery, federal case law in this area also proves helpful to the resolution of this appeal" (quoting *Matter of Aurecchione*, 98 N.Y.2d 21, 26 (2002)).  New York State courts have yet to address the impact of the Supreme Court's recent holding in *Nassar* on the NYSHRL, and the Second Circuit has not yet had the opportunity to address this issue. However, the relevant provisions of Title VII and NYSHRL are textually similar, and both prohibit an employer from discriminating or retaliating against an individual "because" he or she engaged in protected activity.  In *Nassar*, the Supreme Court held that under "the default rules" of statutory construction, "causation" should be interpreted as "but-for causation" "absent an indication to the contrary in the statute itself," and interpreted Title VII's use of "because" as requiring "proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. ---, ---, 133 S. Ct. 2517, 2525, 2528 (2013).  Since the NYSHRL statutory language is the same, and the New York Court of Appeals has consistently stated that federal Title VII standards are applied in interpreting the NYSHRL, this Court will continue to interpret the standard for retaliation under NYSHRL consistent with Title VII jurisprudence, as clarified by the Supreme Court in *Nassar*.  *See, e.g., Russo v. N.Y. Presbyterian Hosp.*, --- F. Supp. 2d ---, ---, 2013 WL 5346427, at *18–19 (E.D.N.Y. Sept. 23, 2013) (interpreting the plaintiff's NYSHRL retaliation claim consistent with his Title VII retaliation claim after *Nassar*); *Leacock*, 2013 WL 4899723, at *9 n.4 (continuing to construe the NYSHRL retaliation standard as requiring the same elements as Title VII after *Nassar* (citing *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, ---, 2013 WL 4432354, at * 19 n.12 (E.D.N.Y. Aug. 14, 2013))); *Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *19 (S.D.N.Y. July 19, 2013) (reviewing the but-for causation requirement for Title VII retaliation articulated in *Nassar* and stating that the plaintiff's "retaliation claim under the NYSHRL is 'analytically identical to [her] claims brought under Title VII'" (citation omitted)).

alleges was retaliatory." *Fincher*, 604 F.3d at 720 (citations omitted); *see also Tepperwien v.
Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n.6 (2d Cir. 2011) (discussing the burden
shifting analysis in retaliation context); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173
(2d Cir. 2005) (same).  If the employer succeeds at the second stage, then the presumption of
retaliation dissipates, and the plaintiff must show that, but for the protected activity, he would not
have been terminated.  *See Nassar*, 570 U.S. at ---, 133 S. Ct. at 2534 (holding that a plaintiff
"must establish that his or her protected activity was a but-for cause of the alleged adverse action
by the employer"); *see also Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL
3968748, at *14 (E.D.N.Y. July 30, 2013) (stating that once the employer succeeds at the second
stage, "the presumption of retaliation dissipates, and the plaintiff must show that, but for the
protected activity, he would not have been terminated" (citing *Nassar*, 570 U.S. at ---, 133 S. Ct.
at 2534)); *Brooks v. D.C. 9 Painters Union*, No. 10-CV-7800, 2013 WL 3328044, at *4
(S.D.N.Y. July 2, 2013) ("If the defendant (articulates a legitimate, non-retaliatory reason), the
plaintiff must offer 'proof that the unlawful retaliation would not have occurred in the absence of
the alleged wrongful action or actions of the employer.'" (quoting *Nassar*, 570 U.S. at ---, 133 S.
Ct. at 2534)).

### i.   Prima Facie Case

In order to establish a prima facie case of retaliation, a plaintiff must establish "(1) she
engaged in protected activity; (2) the employer was aware of this activity; (3) the employee
suffered a materially adverse employment action; and (4) there was a causal connection between
the alleged adverse action and the protected activity."  *Kelly v. Howard I. Shapiro & Assocs.
Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (per curiam) (quoting *Lore v. City of
Syracuse*, 670 F.3d 127, 157 (2d Cir. 2012)); *see also Summa*, 708 F.3d at 125; *Schiano v.
Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).  The burden at the summary

judgment stage for Plaintiff is "'minimal' and '*de minimis*,'" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute*, 420 F.3d at 173 (citations omitted).  Defendant argues that Plaintiff did not engage in "protected activity," Defendant did not know of her protected activity, and Plaintiff cannot establish the required "causal connection."  (Def. Mem. 35–42.)

### 1.  Protected Activity

Plaintiff alleges that she was fired for filing a sexual harassment complaint against Copeland on behalf of Corigliano on August 24, 2010.[26]  (Pl. Opp'n 51–52.)  Under Title VII, protected activity includes both "opposing discrimination proscribed by the statute and . . . participating in Title VII proceedings."[27]  *Jute*, 420 F.3d at 173; *see also Tepperwien*, 663 F.3d at 567 ("Title VII . . . prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity." (citations omitted)); *Hicks v. Baines*, 593 F.3d 159, 161 (2d Cir. 2010) ("Title VII's anti-retaliation provision makes it unlawful 'for an employer to

---

[26]  Corigliano disputes Plaintiff's account of the circumstances which led to the complaint, but it is for the jury to choose between the two conflicting versions of events.  *See In re Fosamax Products Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) (explaining that the "a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury" (quoting *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010)), *cert. denied*, 569 U.S. ---, 133 S. Ct. 2783 (2013); *Milfort v. Prevete*, No. 10-CV-4467, 2013 WL 519041, at *5 (E.D.N.Y. Feb. 13, 2013) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." (citations and internal quotation marks omitted)).

[27]  The New York State Human Rights Law contains similar language prohibiting discrimination "against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."  N.Y. Exec. Law § 296(1)(e).

discriminate against any . . . employee[] . . . because [that employee] opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" (alterations in original) (quoting 42 U.S.C. § 2000e-3(a))).  Title VII's antiretaliation provision is "construed to cover a broad range of employer conduct," *Thompson v. N. Am. Stainless, LP*, 562 U.S. ---, ---, 131 S. Ct. 863, 868 (2011), including voicing complaints on behalf of a coworker, *Gorzynski*, 596 F.3d at 110.  It is not necessary that the conduct was actually prohibited by Title VII, but only that the plaintiff had a "good faith belief" that such conduct was prohibited.  *See La Grande v. DeCrescente Distrib. Co.*, 370 F. App'x. 206, 212 (2d Cir. 2010) ("It is well-established that a 'plaintiff may prevail on a claim for retaliation even when the underlying conduct complained of was not in fact unlawful so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))); *Kanhoye v. Altana Inc.*, 686 F. Supp. 2d 199, 206 (E.D.N.Y. 2009) ("'An employee is privileged to report and protest workplace discrimination, whether that discrimination be actual or reasonably perceived.'  Title VII therefore prohibits an employer from retaliating against an employee for opposing the employer's potentially discriminatory practices." (quoting *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000))).  When making the complaint, a plaintiff must do so in "sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, or national origin."  *Brummell v. Webster Central School Dist.*, No. 06-CV-6437, 2009 WL 232789, at *6 (W.D.N.Y. Jan. 29, 2009).

In order to oppose sexual harassment, Plaintiff need not have filed a formal complaint as long as she complained of activity that she had a good faith, reasonable belief violated the law.

*See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("[T]he law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection, this notion of 'opposition' includes activities such as 'making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.'" (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990))); *see also Bennett v. Hofstra Univ.*, 842 F. Supp. 2d 489, 500 (E.D.N.Y. 2012) (Title VII does not require a formal complaint.); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 227 (E.D.N.Y. 2010) ("It is clearly established that 'informal complaints to supervisors constitute protected activity under Title VII.'" (citations omitted)); *Russell v. County of Nassau*, 696 F. Supp. 2d 213, 237 (E.D.N.Y. 2010) ("Indeed, Title VII's protection against retaliation extends to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer's internal investigation if for no other reason than . . . [w]hen an employee communicates to her employer a belief that the employer has engaged in a form of employment discrimination, that communication virtually always constitutes the employee's opposition to the activity." (alterations in original) (quoting *Crawford v. Metro. Gov't of Nashville and Davidson Cnty. Tenn.*, 555 U.S. 271, 276 (2009)) (internal quotation marks omitted)).

According to Plaintiff, in August 2010, Copeland asked Corigliano to dinner, stating that "his birthday was in August and that he was going to go to her store and take her to dinner that evening."  (Pl. 56.1 ¶¶ 434–37.)  In late August, Corigliano "conveyed to [P]laintiff her discomfort over what she perceived as an untoward overture by Copeland, as well as her desire to evade it and her fear that doing so would prompt Copeland — who had previously placed her on probation — to terminate her."  (*Id.* ¶ 438.)  Corigliano told Plaintiff that she had "already

been down that road before" with Jasner and did not "want to go down it again," and Plaintiff

understood "that road" as "having been a sexual relationship with her [Director of Stores]

supervisor."[28]  (*Id*. ¶ 439.)  Corigliano "expressed trepidation at raising the matter with Human

Resources herself and requested that [P]laintiff do so on her behalf."  (*Id*. ¶ 440.)  Plaintiff

agreed, and immediately "apprised Thoma of Corigliano's concerns, calling it 'an issue of

potential sexual harassment,' and including in its description the non-business-related particulars

of Copeland's approach, which particulars Thoma recorded in notes concerning the matter, as

well as the way Corigliano had framed her resultant fears by referencing her sexual past with

Jasner and expressing a wish not to see it repeated."  (*Id*. ¶ 441.)  Plaintiff told Thoma that

Corigliano felt uncomfortable with Copeland's invitation but was concerned that she would be

fired if she did not go to dinner, and that Corigliano felt uncomfortable because she had "already

gone down that road before" with Jasner.  (Pl. Dep. 233–36.)  Plaintiff understood "down that

road" to mean a sexual relationship, (Pl. Decl. ¶ 21), and she told Thoma that she was raising "an

issue of potential sexual harassment" and that Copeland's invitation was of a personal nature.[29]

---

[28]  According to Corigliano, she never told Plaintiff that she felt harassed by Copeland's request or believed that it was sexual in nature.  (Corigliano Decl. ¶ 9.)

[29]  Defendant argues that Plaintiff cannot establish that she had a reasonable belief that she was engaging in protected activity because Corigliano was only concerned about how Defendant would view her actions if she went to dinner with Copeland, but she did not view the dinner invitation as a sexual advance.  (Def. Mem. 37.)  Plaintiff testified during her deposition that Corigliano was concerned that the Gindis would think she was lying, and that Corigliano was nervous because of her "prior fraught experience," in which she had been "nervous that she was going to lose her job with . . . because of her relationship with [Jasner], sleeping with the director of stores, it's like a pattern and she was afraid."  (Pl. Dep. 228:6–30:13.)  Plaintiff stated in her declaration that Corigliano was concerned that Copeland would lead her into another sexual relationship.  (Pl. Decl. ¶ 21.)  Defendant argues that Plaintiff is "attempt[ing] to change the substance of her testimony," (Def. Reply 26–27), but there is no contradiction between Plaintiff's deposition and her declaration.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 104 (2d Cir. 2010) ("We have held that a party cannot create an issue of fact by submitting an

(Pl. Decl. ¶ 21.)  Plaintiff's statement is supported by the fact that Thoma's notes indicate that Plaintiff called her and asked "if she could speak to [Thoma] about a potential sexual harassment issue."  (Pl. Ex. 37.)  Thoma now claims that Plaintiff's complaint "didn't sound like a case of sexual harassment," but Thoma admits that she did not conclude that at the time she received the complaint.  (Thoma Dep. 82–83, 96–97.)  Thoma stated in her notes that she told Plaintiff that she "did not necessarily think that this was a case of sexual harassment," making it clear that Plaintiff did complain about sexual harassment.  (Pl. Ex. 37.)  Although Defendant argues that Copeland's invitation was solely business related, Plaintiff is not required to "establish that the conduct she opposed was actually in violation of Title VII," only that she had a good faith reason to believe that it was.  *Galdieri*, 136 F.3d at 292.

This evidence is sufficient for a jury to find that Plaintiff had a good faith, reasonable belief that she was complaining of sexually harassing conduct — an unwanted sexual advance by Copeland toward Corigliano.  *See Raeman v. Cnty. of Ontario*, No. 12-CV-6009, 2013 WL 956758, at *7–8 (W.D.N.Y. Mar. 12, 2013) (explaining that the "gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome").  Plaintiff specifically told Thoma that she was raising a "potential sexual harassment" issue.  *See Brown v. City of New York*, No. 11-CV-2915, 2013 WL 3789091, at *15 (S.D.N.Y. July 19, 2013) (finding that the plaintiff's memorandum describing the offender's "troubled and provocative" behavior was not protected activity because it made "no explicit mention of any alleged sexual harassment" and only made "glancing references to any gender-focus on that behavior.").  Plaintiff has presented

---

affidavit in opposition to summary judgment that contradicts prior deposition testimony.  If, however, the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat summary judgment." (citation omitted)).  Plaintiff's declaration merely explains and clarifies her deposition testimony.

sufficient evidence from which a jury could find that she had a good faith belief that that there

was a "potential sexual harassment" situation, and that she reported that concern to Thoma.

### 2.  Knowledge

Plaintiff has offered sufficient evidence from which a reasonable jury could conclude that

Defendant knew of her protected activity.  In order to satisfy the requirement of employer

knowledge, the plaintiff must establish that the employer understood, or could reasonably have

understood, that the plaintiff's opposition was directed at prohibited conduct.  *See Fattoruso v.*

*Hilton Grand Vacations Co., LLC*, --- F. App'x, ---, 2013 WL 2123088, at *1 (2d Cir. May 17,

2013) (finding that the plaintiff failed to demonstrate that the defendant had knowledge of his

protected activity because his complaints "did not explicitly or implicitly alert [the defendant]

that he was complaining of disparate treatment based on sex — and thereby was engaging in a

protected activity"); *Rosioreanu v. City of New York*, --- F. App'x ---, ---, 2013 WL 1943273 (2d

Cir. May 13, 2013) (explaining that "implicit in the requirement that the employer [was] aware

of the protected activity is the requirement that the [employer] understood, or could have

reasonably understood," that the plaintiff's complaints, constituting the protected activity, were

based on conduct prohibited by Title VII" (alterations in original) (quoting *Galdieri-Ambrosini v.*

*Nat'l Realty & Dev't Corp.*, 136 F.3d 276 (2d Cir. 1998).  It is not necessary that Plaintiff prove

that the specific actors knew of the protected activity as long as Plaintiff can demonstrate general

corporate knowledge.  *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81,

92 (2d Cir. 2011) ("Even if the agents who carried out the adverse action did not know about the

plaintiff's protected activity, the 'knowledge' requirement is met if the legal entity was on notice.

'Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement,

anything more is necessary than general corporate knowledge that the plaintiff has engaged in a

protected activity.'" (citations omitted)); *Henry*, 616 F.3d at 148 ("[A] jury may 'find retaliation

even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicit[ly] upon the orders of a superior who has the requisite knowledge.'" (alteration in original) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000))); *Trivedi v. N.Y. Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 736 (S.D.N.Y. 2011) ("A plaintiff need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation to make out a *prima facie* retaliation claim; rather, 'general corporate knowledge that the plaintiff has engaged in a protected activity' is sufficient." (citations omitted)).

Defendants admit that on August 24, 2010, Plaintiff called Thoma to advise her that Copeland had invited Corigliano to dinner and that "Corigliano was unsure how she should handle the invitation given her prior affair with Jasner." (Def. 56.1 ¶ 143.) Thoma's notes demonstrate that Plaintiff identified the situation as a "potential sexual harassment issue." (Pl. Ex. 37.) Although Defendant argues that Corigliano was only concerned about Defendant's perception of the dinner and that Plaintiff did not believe, or could not have reasonably believed, that she was reporting possible sexual harassment, these are factual issues to be decided by a jury. Since Defendant knew Plaintiff raised concerns of "potential sexual harassment" with Thoma, Plaintiff has established that Defendant had knowledge of her purported protected activity.

### 3.   Adverse Employment Action

Plaintiff has satisfied the adverse employment action element. Plaintiff was terminated. Being fired is an adverse employment action. *See Sanchez v. Conn. Natural Gas Co.*, 421 F. App'x 33, 35 (2d Cir. 2011) (listing third element of prima facie case of retaliation as "termination from employment or other adverse employment action"); *Miller v. Praxair, Inc.*,

408 F. App'x 408, 410 (2d Cir. 2010) (noting that "typical examples of actionable adverse

employment actions include 'termination of employment, a demotion evidenced by a decrease in

wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished

material responsibilities'" (quoting *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.

2000))); *Feingold*, 366 F.3d at 156 ("(Plaintiff) suffered an adverse employment action when he

was fired."); *Reynoso v. All Foods, Inc.*, 908 F. Supp. 2d 330, 342 (E.D.N.Y. 2012) (stating

plaintiff's "termination clearly constitutes an adverse employment action").

### 4.   Causation

Drawing all inferences in favor of Plaintiff, Plaintiff has established a causal connection

between her protected activity and her termination.  "[A] plaintiff can indirectly establish a

causal connection to support a discrimination or retaliation claim by showing that the protected

activity was closely followed in time by the adverse employment action."[30] *Gorzynski*, 596 F.3d

at 110–11 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d

545, 554 (2d Cir. 2001)); *see also Kim v. Columbia Univ.*, 460 F. App'x 23, 25 (2d Cir. 2012)

("[T]emporal proximity between protected activity and adverse action may be sufficient to

satisfy the causality element of a prima facie retaliation claim . . . ."); *Feingold*, 366 F.3d at 156

("[T]he requirement that [plaintiff] show a causal connection between his complaints and his

---

[30]   The Supreme Court has recently ruled that under Title VII, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 570 U.S. at ---, 133 S.Ct. at 2534.  While temporal proximity alone may still be sufficient at the prima facie stage, it is not sufficient at the pretext stage.  *Compare Rivera v. N.Y.C. Dep't of Correction*, No. 06-CV-862, 2013 WL 3297597, at *4 (E.D.N.Y. June 28, 2013) (incorporating the "but-for" causation standard into the prima facie case); *with Leacock*, 2013 WL 4899723, at *11 (analyzing the "but-for" causation standard at the pretext stage); *Dall*, --- F. Supp. 2d at ---, 2013 WL 4432354, at *22, n.15 (same); *Moore v. Kingsbrook Jewish Med. Ctr.*, No. 11-CV-3625, 2013 WL 3968748, at *14 (E.D.N.Y. July 30, 2013) (same); *Brooks v. D.C. 9 Painters Union*, No. 10-CV-7800, 2013 WL 3328044, at *4 (S.D.N.Y. July 2, 2013) (stating that "but for" causation must be proved if the defendant articulates a legitimate, non-retaliatory reason for the adverse employment action).

termination is satisfied by the temporal proximity between the two."); *Trivedi*, 818 F. Supp. 2d at 736 ("Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a prima facie case.").  There is no bright line rule for how long after a plaintiff has engaged in the protected activity that the adverse action must have occurred to benefit from the inference but generally courts measure the time in months.[31]  *See, e.g.*, *Gorzynski*, 596 F.3d at 110–11 ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship."); *Gordon-Bakos v. Cornell Coop. Ext.*, 252 F.3d 545, 554–55 & n.5 (2d Cir. 2001) (finding spans of four and five months sufficient to establish a causal relationship); *Smith v. Town of Hempstead Dept. of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 457 (E.D.N.Y. 2011) ("With regard to the establishment of a prima facie case through temporal proximity, the Second Circuit has not drawn a bright line as to how closely an adverse employment action must follow protected activity to imply that retaliation has taken place." (citing *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)); *Laudadio v. Johanns*, 677 F. Supp. 2d 590, 614 (E.D.N.Y. 2010) ("There is no bright-line beyond which a temporal relationship is too attenuated to prove causation." (citations omitted)).

---

[31]  Defendant argues that "an adverse action cannot be longer than a couple of months for an inference of causation to exist in a retaliation case." (Def. Mem. 42.)  Although some courts have found that the passage of more than two months is too long to suggest an inference of causation, *see, e.g. Garrett v. Garden City Hotel, Inc.*, No. 05-CV-0962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007), the Second Circuit has held that "five months is not too long to find the causal relationship."  *Gorzynski*, 596 F.3d at 110.

Plaintiff argues that immediately after Copeland learned of her conversation with Thoma on August 24, 2010, he embarked on a retaliatory campaign of harassment against Plaintiff, which ultimately led to her probation and eventual termination. (Pl. Opp'n 56–60.) Defendant argues that when it decided to place Plaintiff on probation in early September 2010, the decision-makers Raymond and Copeland did not know about Plaintiff's conversation with Thoma. (Def. Mem. 39–40; Def. 56.1 ¶ 153.) According to Defendant, Copeland first learned of Corigliano's concerns about having dinner with him in mid to late September, and Raymond first learned of Plaintiff's conversation with Thoma in early November 2010. (Def. 56.1 ¶¶ 153–55.) Plaintiff argues that Thoma must have discussed Plaintiff's complaint with Copeland sooner. (Pl. 56.1 ¶¶ 449–54.) Even if Thoma did not address Plaintiff's complaint with Copeland until late September, Thoma testified that, upon broaching the matter with Copeland, Copeland replied that "[h]e had already known about it." (Thoma Dep. 93–94.) In any event, Plaintiff is not required to prove that Copeland and Raymond knew of her complaint. The fact that Thoma, Defendant's human resources representative, knew of her complaint is sufficient to establish general corporate knowledge, which is sufficient to satisfy her burden at the prima facie stage. *See Trivedi*, 818 F. Supp. 2d at 736 (holding that "[a] plaintiff need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation to make out a *prima facie* retaliation claim" (citations omitted)). More importantly, Plaintiff has established that she was terminated less than four months after she complained to Thoma about a potential sexual harassment issue, and that alone is sufficient to raise an inference of causation. Viewing the evidence in the light most favorable to Plaintiff, the Court finds that Plaintiff has established a causal connection between her protected activity and subsequent termination.

### ii.   Non-Discriminatory Explanation

Since Plaintiff has established a prima facie case of retaliation, a presumption of retaliation arises and Defendant must articulate a legitimate reason for Plaintiff's termination. *Fincher*, 604 F.3d at 720.  Defendants argue that Copeland terminated Plaintiff because she "failed to improve her performance as required under the terms of her probation," he did not believe Plaintiff had the "ability to lead at a senior level," she "had not completed the merchandising manuals, the sign program, the stockroom standards project or follow up Copeland had requested that [Plaintiff] perform on the stop, start and continue project," failed to meet the goals set forth in her performance improvement plan, "failed to take responsibility for her actions and deficiencies in her work product," and was disrespectful.  (Def. 56.1 ¶¶ 214–18.) These are legitimate reasons for Plaintiff's termination.  *See Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) ("An employer's dissatisfaction with even a qualified employee's performance may, of course, ultimately provide a legitimate, non-discriminatory reason for the employer's adverse action."); *Yoselovsky v. Associated Press*, 917 F. Supp. 2d 262, 275 (S.D.N.Y. 2013) (finding that the defendant met its burden by providing that the plaintiff's job performance "had, for many months, fallen well below his managers' expectations," and his "managers eventually determined that his performance had not improved to an acceptable level and made the decision to terminated him").  Defendant has met its burden.

### iii.   Pretext

To avoid summary judgment, Plaintiff must offer evidence from which a reasonable jury could conclude by a preponderance of the evidence that but for the sexual harassment complaint, she would not have been terminated.  In order to establish but-for causation, Plaintiff must prove that her termination would not have occurred in the absence of a retaliatory motive.  Plaintiff argues that prior to filing the sexual harassment complaint with Thoma, she received praise and

positive feedback from her bosses, including Copeland, but after her complaint to Thoma, Copeland began a retaliatory campaign against her, ultimately culminating in her termination. (Pl. Opp'n 54–55.)  *See Brummell v. Webster Cent. Sch. Dist.*, No. 06-CV-6437, 2009 WL 232789, at *8 (W.D.N.Y. Jan. 29, 2009) ("[T]here is no doubt that sudden criticisms of an employee's work performance made after the employee has engaged in protected activity is the archetype form of retaliation . . . .").  Defendant argues that Plaintiff was terminated due to her poor work performance and attitude.  (Def. Reply 31.)  The evidence before the Court demonstrates that Defendant's perception of Plaintiff's work performance changed in late August 2010.  According to Defendant, Plaintiff did not perform well in her new position, but it was not until late August 2010 that Raymond and Copeland began to realize the full extent of the problem.  (Def. 56.1 ¶ 129.)  Copeland and Raymond received complaints regarding Plaintiff at that time and met to discuss potential options.  Plaintiff argues that these complaints were baseless, but Copeland used them, other baseless complaints, and his own manufactured complaints, to retaliate against Plaintiff and ultimately to terminate her employment.  (Pl. Opp'n 54–62.)

The evidence shows that prior to August 2010, Plaintiff received positive reviews regarding her work performance, and her job responsibilities were constantly expanded.[32]

---

[32]  Following Thoma's investigation into Plaintiff's complaints about Copeland, she prepared a report based on 29 witness interviews and numerous documents.  (Def. 56.1 ¶ 210; Thoma Decl. ¶¶ 40–66.)  Although some of these statements contain complaints about Plaintiff's behavior prior to her filing of the sexual harassment complaint against Copeland, these complaints were all made after the fact and do not appear to have been contemporaneously reported.  This lack of contemporaneous records regarding Plaintiff's supposedly problematic performance, contrasted with Plaintiff's positive written evaluations, "requires a credibility determination that is properly made by a jury."  *Klings v. New York State Office of Court Admin.*, No. 04-CV-3400, 2010 WL 1292256, at *16 (E.D.N.Y. Apr. 5, 2010) (quoting *Collins,* 2008 WL 2971668, at *11); *Sklaver v. Casso-Solar Corp.*, 2004 WL 1381264, at *9 (S.D.N.Y. May 14,

Although "[p]rior good evaluations alone cannot establish that later unsatisfactory evaluations are pretextual," *Hines v. Hillside Children's Center*, 73 F. Supp. 2d 308, 315 (W.D.N.Y. 1999), the fact that "evaluations of the plaintiff post-dating the protected activity contradict earlier evaluations" may serve as evidence of pretext. *Ibok v. Securities Indus.*, 369 F. App'x 210, 213 (2d Cir. 2010) (citing *Trealia v. Town of Manlius*, 313 F.3d 713, 722 (2d Cir. 2002)); *see also Curcio v. Roosevelt Union Free Scho. Dist.*, No. 10-CV-5612, 2012 WL 3646935, at *14 (E.D.N.Y. Aug. 22, 2012) ("Courts have noted that a sudden drop-off in performance evaluations can serve as evidence that would raise an inference of retaliation.").  Although Defendant argues that the change in Plaintiff's evaluations was the result of her inability to adjust to her new position, Plaintiff initially received praise for her work as Senior Manager of Operations.  For example, the weekly newsletter that Plaintiff designed was praised by its recipients.  Thoma send her an email stating "That is great Lori!," (Pl. Ex. 54), and Copeland sent an email stating "Great kick-off!  That is what we needed!" (Pl. Ex. 21).  Copeland also congratulated Plaintiff on her receipt of recognition of her newsletter from others.  (Pl.  Ex. 54.)  It was not until after Plaintiff complained to Thoma on behalf of Corigliano that Copeland began criticizing Plaintiff's work on

---

2004) ("Supporting documentation and explanations created after an employee's termination are 'suspect,' particularly when they do not accord with prior performance evaluations."). Defendant argues that Copeland expressed disapproval with Plaintiff in March 2010 regarding the grand opening of the Rego Park store.  (Def. 56.1 ¶¶ 112–14.)  Copeland told Plaintiff that D'Agata felt that she was not letting him run his store and that she was intrusive.  (Def. 56.1 ¶ 114.)  However, this incident occurred before Copeland gave Plaintiff a positive review on March 23, 2010, for the work she performed in 2009.  During the March 23, 2010 review, Copeland stated "I know 2010 will be another big year for you in making Century 21 the best retail company ever!"  (Pl. Ex. 20.)  Following this alleged incident at the Rego Park store, Plaintiff was promoted to Senior Manager of Operations and was, among other things, given official supervision over the coordinators.  (Pl. Ex. 44.)  Viewing the evidence in the light most favorable to Plaintiff, any disapproval Copeland may have expressed in March 2010 was minor and not inconsistent with Plaintiff's theory that Copeland had a sudden and dramatic shift in his perception of her work in fall 2010.

the newsletter.  Kyle praised Plaintiff's work cleaning and reorganizing the 700 building, stating that he was "shocked" with her progress and that she was "#1 in [his] book."  (Pl. Ex. 45.)  I.G. congratulated her on a "[g]reat job."  (*Id.*)  Carpenter thanked her for "creat[ing] an open door[,] having more dialogue and allowing a forum for discussions" that helped her grow professionally.  (Pl. Ex. 46.)  After Copeland announced that Plaintiff was receiving official authority over the Coordinators on August 12, 2010, Thoma congratulated her and offered her "full support."  (Pl. Ex. 44.)

In addition to the sudden change in Plaintiff's evaluations, Plaintiff has presented evidence that many of Copeland's criticisms that resulted in her being placed on probation were baseless.  In her PIP, Copeland criticized Plaintiff for an "Email Pads" project, but at the time of that project's completion four months earlier, Copeland had expressed his satisfaction with Plaintiff's work verbally and in writing.  (Pl. Dep. 442–43; Pl. Exs. 48, 56.)  Copeland criticized Plaintiff for the signage project that failed due to the IT department, the fitting room stools project that had been assigned to employees other than Plaintiff and never been approved, and the newsletter for which Copeland had previously praised her.  He also criticized Plaintiff for failing to seek his approval about a manual after failing to return her phone calls and emails, and cancelling a meeting.  Defendant argues that Plaintiff failed to demonstrate a proper attitude or show improvement while on probation, but Plaintiff testified that, despite feeling attacked by Copeland, she asked Copeland how she could improve and he refused to give her specific information or instruction.  *Curcio*, 2012 WL 3646935, at *15–16 (denying summary judgment on plaintiff's retaliation claim in part because plaintiff claimed that his supervisor "imposed unrealistic demands and set him up for failure").

Plaintiff has provided evidence that despite some complaints about her work prior to filing a complaint for sexual harassment against Copeland, she was applauded and given positive performance evaluations, but that after she filed the sexual harassment complaint against Copeland, everything she did was criticized — even actions for which she was previously praised.  Copeland began baselessly criticizing her performance, refused to meet with her and to take her calls, all of which led to the eventual termination of Plaintiff.  *Curcio*, 2012 WL 3646935, at *15–16 (finding disputed issues of fact existed prevented summary judgment because a reasonable jury could conclude that the "escalating criticisms and negative performance reviews, ultimately culminating in a denial of tenure," were pretext for retaliation). Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Copeland's criticisms were disingenuous and motivated by retaliatory motives, and but for Plaintiff's complaint to Thoma, Copeland would not have criticized Plaintiff's performance and Plaintiff would not have been terminated, making retaliation a but-for cause of Plaintiff's termination.  Defendant's motion for summary judgment as to Plaintiff's retaliation claims is denied.

### III.  Conclusion

For the reasons discussed above, Defendant's motion for summary judgment is denied in its entirety.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 28, 2013
        Brooklyn, New York